658 P.2d 210

NATIONWIDE RESOURCES CORPORATION, an Arizona corporation, Plaintiff/Appellant,

v.

Bertha S. MASSABNI and Fadlo Massabni, husband and wife; and Pierre M. Zouheil, Defendants/Appellees.

No. 2 CA–CIV 4293.

Court of Appeals of Arizona, Division 2.

Nov. 4, 1982.

Rehearing Denied Dec. 20, 1982.

Review Denied Jan. 25, 1983.

Miller & Pitt, P.C. by John A. Baade, Tucson, for plaintiff/appellant.

Kerley & Defrancesco by Joseph J. Defrancesco, Sierra Vista, for defendants/appellees.

## OPINION

HOWARD, Chief Judge.

This is a contract case. The major issue is whether there was a valid offer and

acceptance. Appellees have filed a "cross-appeal". However, since they prevailed in the trial court, we shall treat their cross-appeal as a cross-issue. See *DeLozier v. Smith,* 22 Ariz.App. 136, 524 P.2d 970 (1974); *Aegerter v. Duncan,* 7 Ariz.App. 239, 437 P.2d 991 (1968).

Nationwide Resources Corporation (Nationwide) owned a restaurant business in Sierra Vista, known as the A & W Drive-In Restaurant. The owner of the real estate on which the restaurant was located was Cochise Enterprises, Inc. Fadlo Massabni was a colonel in the United States Army stationed at Fort Huachuca, which is located adjacent to Sierra Vista. Pierre Zouheil was a friend of the Massabnis and lived in Morocco.

The business was listed with Century 21 Great American Realty, a Sierra Vista brokerage, through Vicki Dickson. Richard Hyatt, an agent of Century 21, showed the A & W restaurant to the Massabnis and Zouheil. Thereafter, Mrs. Massabni, with her husband's consent, formed a partnership with Zouheil in order to purchase and operate the restaurant. The actual operation of the restaurant was to be done by Mrs. Massabni. Mrs. Massabni and Zouheil were to be 50–50 partners. She contributed $16,000 to the partnership capital, which came from a loan that Colonel Massabni had obtained for her. This loan was secured by a joint account.

On August 14, 1978, Mrs. Massabni and Zouheil made an offer to buy the restaurant. After negotiating with Harold Freedman, the vice president of Nationwide, they arrived at new terms and on August 16, 1978, the partners signed a written offer to buy the business and assume the existing 18-year lease.

The partners, in accordance with the terms of their offer, also signed a $2,000 promissory note, which was an earnest money deposit and was to be redeemed by them ". . . upon written acceptance of the offer".

The written offer had a signature line for the seller with the legend: "Acceptance of Offer: I (or we) accept this offer to sell the above described property on the terms and conditions herein stated, acknowledge receipt of a copy of this document, and agree to pay the Broker's fee. . . ."

On the evening of August 16, Hyatt and Mrs. Massabni spoke on the telephone with Morton Freedman, the president of Nationwide and brother of Harold Freedman. Morton was in California at the time. Hyatt related the terms of the offer to Morton who in turn told Mrs. Massabni that they were acceptable. Hyatt told the partners that a mailgram confirming the acceptance would be forthcoming.

The next morning Hyatt called Harold Freedman who lived in Tucson, told him what had happened the night before and asked him to send an acceptance by mailgram. After consulting with his brother on the telephone, Harold sent the following mailgram to Vicki Dickson:

"PURCHASE OFFER MADE BY P. ZOUHEIL AND MASSABNI ON 8–16–78 FOR FULL PRICE OF $76,240.00 IS HEREBY ACCEPTED.

HAROLD FREEDMAN."

On August 19, Hyatt gave the mailgram to Mrs. Massabni and Zouheil. Pursuant to the terms of their offer the partners redeemed the promissory note by giving Hyatt a check for the earnest deposit.

After receiving the mailgram Mrs. Massabni visited the restaurant almost every day, inquired about the repair required by the contract, interviewed the employees of the restaurant, proposed "house rules" to govern their conduct, and obtained an application for a business license.

In the meantime, Morton Freedman received a copy of the contract. It was noticed that there were errors in the contract. For example the offer erroneously provided that the sellers, rather than the buyers, would give the promissory note by which the bulk of the purchase price was to be paid. Furthermore, it failed to provide that the note would be secured by the property. All parties agreed that this was an error and that the note was to be secured.

Morton Freedman took the agreement to his lawyer, Marvin Cohen, and asked Cohen

to do whatever was appropriate to correct the situation. Cohen made an addendum to the agreement and sent it to Hyatt with the following letter:

"Enclosed please find a form of addendum to the offer of August 16, 1978 from Zouheil and Massabni. I understand that the seller is willing to sell on the terms stated in said offer, as amended by the enclosed form of addendum.

Please advise me or the Freedmans concerning the willingness of Zouheil and Massabni to agree to the enclosed addendum.

If there are any problems with the form, please let me know . . . ."

The addendum did three things. It corrected the scriveners errors with respect to who was giving the note, it provided that the note would be secured and, in exchange for a personal guarantee of one-half the amount of the note by Colonel and Mrs. Massabni, it permitted a corporation to execute the closing documents instead of Zouheil and Mrs. Massabni. (Zouheil and the Massabnis had seen Robert Morrison, an attorney, on August 18, 1978, about incorporating.) On August 25, the Massabnis had decided not to go through with the purchase of the restaurant and they went to see Robert Morrison, their lawyer. Morrison had obtained a copy of the addendum. Colonel Massabni was not in agreement with the personal guarantee and Morrison contacted Nationwide. He told them that Mrs. Massabni would not go through with the purchase.

The final closing of the sale was scheduled for September 22, 1978, and on that date Morrison wrote the following letter to the title company:

"I represent Pierre M. Zouheil and Bertha S. Massabni who, on August 16, 1978, tendered an offer to purchase the A & W Drive-In Restaurant located at 1287 Frey Boulevard, Sierra Vista, Arizona. The offer to purchase was rejected by the sellers by virtue of a letter written August 23, 1978, by Marvin S. Cohen, Esq., attorney for the sellers, which letter contained an enclosure in the form of an addendum to the offer made by the purchasers which addendum was not approved.

It is my opinion that Mr. Cohen's letter of August 23, 1978, clearly operates as a rejection of the offer of Pierre M. Zouheil and Bertha S. Massabni, and therefore, I hereby make a demand upon you to return the $2,000.00 earnest money which was submitted with the offer to purchase, dated August 16, 1978."

We should also mention that Cochise Enterprises, Inc., had, on September 7, 1978, executed a release and consent to assignment, which released the present lessees, Michael J. McGinn and Hope McGinn, from the A & W Drive-In lease and consented to the sublease of the property to Zouheil and Mrs. Massabni. The closing never took place and this suit followed.

The case was tried to the court sitting without a jury, and judgment was entered for appellees after written findings of fact and conclusions of law were made. The conclusions of law upon which its final judgment was based were as follows:

"* * *

6. Since Bertha Massabni and Peter Zouheil were married and their spouses did not sign the offer, the offer violated the provisions of A.R.S. 25–214(c)(1).

7. The interest of Bertha Massabni and Peter Zouheil and that of their respective spouses, in the business venture was community property.

8. The unsigned mailgram violated the Statute of Frauds.

9. The offer as written required that the acceptance contain the signature of the seller.

10. No circumstances justified the use of a mailgram as a substitute for a written acceptance containing the signature of the seller.

11. The offer was withdrawn by the Plaintiff prior to acceptance.

12. Plaintiffs, by their counter offer made by Mr. Cohen, withdrew the offer."

Appellant presents the following questions for our review: "1. Whether the

mailgram was an acceptance of the offer of August 16, 1978. 2. Whether A.R.S. § 25–214(c)(1) prohibits a partnership from leasing real property without the signature of the spouse of every partner, even where the spouses in fact consent to the lease. * * * "

## THE OFFER

■ Were the signatures of the spouses of Mrs. Massabni and Zouheil necessary in order to make a valid offer? Since the leasehold interest was involved, appellees contend that A.R.S. § 25–214(C)(1), which requires both spouses to join in any transaction involving the acquisition of an interest in real estate, required the signatures of the respective spouses. We first note that there is no evidence that Zouheil was married. In any event, the joinder of the spouses was not necessary.

DeFuniak in his work Principles of Community Property, discusses the problem:
" * * *

If the wife becomes a partner in a commercial partnership and invests or employs therein community property under her management or community property under the management of the husband and which he consents to her so using, or even if her contribution to the partnership consists of her services which is to entitle her to membership, the partnership earnings and gains to which she becomes entitled constitute community property. But it must be kept in mind that the marital ownership of such earnings and gains, or in other words the ownership therein of the wife and her husband by halves, exists only as they represent profits coming from the wife's partnership interest after the claims of the partnership creditors and the equities of the partners have been satisfied. Likewise, so far as community property is invested by the wife in the commercial partnership, any rights of the spouses therein, as a marital community, are not establishable until the satisfaction of the claims of the partnership creditors and partners' equities. So far, then, as concerns the husband's half ownership in these profits, by reason of their being community property, he acquires it only when the profits accrue to the wife after satisfaction of the aforementioned claims. *Until then he has no half ownership and he has no voice in the management of the commercial partnership.* In short, he is not a partner in that commercial partnership just because his wife is, any more than he would be an employee of one for whom the wife is rendering services as a registered nurse although her earnings therefrom as they accrued would be half his as the community property...." (Emphasis added) DeFuniak & Vaughn, Principles of Community Property (1971).

The foregoing principles enunciated by De-Funiak are followed in Arizona. In *Cummings v. Weast,* 72 Ariz. 93, 231 P.2d 439 (1951) a husband loaned community funds to a corporation. A series of other transactions between the husband and the principals of the corporation resulted in the husband obtaining a 50 per cent interest in the partnership. The only asset of the partnership was land. Ultimately, the husband sold his interest in the partnership to the other partners. The sale was in the form of a quit claim deed to the land. The wife joined in none of these transactions, and refused to quit claim the land to the other partners.

The other partners sued the wife to quiet title to the land and she defended on the ground that a husband had no power to convey community property without her joinder. Our supreme court disagreed holding that the wife's community interest in the partnership as subordinate to the right of the partners to deal with the partnership property. Although *Cummings v. Weast,* supra, dealt with a conveyance of real property instead of an acquisition, it is still analogous to the situation here.

In *Attaway v. Stanolind Oil & Gas Co.,* 232 F.2d 790 (10th Cir.1956) a partnership owned certain mineral rights. One of the partners was married and under New Mexico law a community mineral interest could not be leased without joinder of the spous-

es. The partnership leased the mineral rights to another. The wife of one of the partners did not sign the lease. In seeking to avoid the lease, the partners' grantee argued that the interest of the married partner and his wife in the partnership realty was community property and thus not subject to alienation through a lease without the joinder of the wife. The court held that although the wife had a community property interest in the partnership, her joinder was not necessary to alienate partnership property.

We note that Texas' Uniform Partnership Act specifically provides that a partner's rights in specific partnership property are not community property. See *McKnight v. McKnight,* 543 S.W.2d 863 (Tex.1976).

While Arizona does not have such a statute similar to that of Texas, we believe that A.R.S. § 29–225, which deals with the nature of a partner's right in specific partnership property, demonstrates that the community has no interest in specific partnership property.[1] In the foregoing statute a partner is a co-owner with his partners of specific partnership property holding as a tenant in partnership. The incidence of this tenancy are such that: (1) A partner has an equal right with his partners to possess specific partnership property for partnership purposes without the consent of his partners; (2) a partner's right in specific property is not assignable except in connection with the assignment of rights of all the partners in the same property; (3) a partner's right in specific partnership property is not subject to attachment or execution except on a claim against the partnership, and (4) on the death of a partner his right in specific partnership property vests in the surviving partner or partners, except where the deceased was the last surviving partner.

We recognize that in *Coe v. Winchester,* 43 Ariz. 500, 33 P.2d 286 (1934) the court held that under community property laws of this state the assets of a partnership belonged in equal parts to the partners and their wives. However, this case was decided prior to Arizona's enactment of the Uniform Partnership Act.

We further note that A.R.S. § 29–226 provides that a partner's interest in the partnership is his share of the profits and surplus, and that the same is *personal property.*

The offer was in writing and signed by the parties to be charged, thus satisfying the statute of frauds. *Young v. Bishop,* 88 Ariz. 140, 353 P.2d 1017 (1960); *Shreeve v. Greer,* 65 Ariz. 35, 173 P.2d 641 (1946); *Bartlett-Heard Land Etc. Co. v. Harris,* 28 Ariz. 497, 238 P. 327 (1925); A.R.S. § 44–101(6). The trial court erred in finding that the spouses had to sign the offer.

## THE ACCEPTANCE

■ The majority rule is that the contract must be signed by the party against whom it is sought to be enforced, but not by the party who seeks to enforce it and a written offer signed by the party sought to be charged, if orally accepted by the person to whom it is made, will be sufficient to satisfy the statute of frauds. *Young v. Bishop,* supra; *Bartlett-Heard Land Etc. Co. v. Harris,* supra; and see Annot. 30 A.L.R.2d 972 (1953). The trial court erred in concluding that the mailgram had to satisfy the statute of frauds. But in any event, the mailgram did satisfy the statute of frauds. See *Bartlett-Heard Land Etc. Co. v. Harris,* supra, in which the court held that a series of telegrams constituted an offer which would satisfy the statute of frauds. And see also *Hillstrom v. Gosnay,* 614 P.2d 466 (Mont.1980); *Joseph Denunzio Fruit Co. v. Crane,* 79 F.Supp. 117 (S.D.Cal. 1948); *La Mar Hosiery Mills, Inc. v. Credit & Commodity Corp.,* 28 Misc.2d 764, 216 N.Y.S.2d 186 (1961); *Yaggy v. B.V.D. Company,* 7 N.C.App. 590, 173 S.E.2d 496 (1970); *Heffernan v. Keith,* 127 So.2d 903 (Fla.App. 1961); Williston on Contracts, § 568 (3d ed. 1961). The mailgram constituted a signed, written acceptance by Nationwide.

■ The trial court further erred in its conclusions of law numbers 11 and 12,

---

1. In accord with this conclusion is the work of Crane and Bromberg, Partnership, § 45 (1968).

which we have previously set forth. The affect of the acceptance was to convert the offer into a binding contract. *East Central Oklahoma Electric Coop., Inc. v. Oklahoma Gas & Electric Co.,* 505 P.2d 1324 (Okla. 1973); see 17 Am.Jur.2d Contracts § 41 (1964) and the numerous cases cited in fn. 9; and see also Restatement (Second) of Contracts §§ 3, 22 (1981).

■ The trial court, in its findings of fact and conclusions of law, characterized Cohen's letter as a "counter offer" and found that Cohen's proposed addendum to the offer and his letter showed that Nationwide "... did not consider the mailgram to be a valid acceptance." The trial court's conclusions of both fact and law were clearly erroneous. The unequivocal acceptance of the offer formed a contract regardless of any undisclosed intent by Nationwide. A manifestation of acceptance to the offeror or his agent forms a contract regardless of the intent of the acceptor. *Sheedy v. Stall,* 255 Or. 594, 468 P.2d 529 (1970); Calamari and Perillo, Contracts § 26 (1970). The contract was created, at the latest, when the mailgram was received by the partners, who could not thereafter revoke their offer.[2]

Parties to an unperformed contract may, by mutual consent, modify it. *Barrett v. Duzan,* 114 Ariz. 137, 559 P.2d 693 (1977). Cohen's addendum was, at most, a request to modify an already existing contract. The parties' failure to agree to the addendum did not affect the already existing contract.

## THE CROSS–ISSUES

Appellees contend that the trial court erred in not finding (1) that all conditions precedent to the assumption of the lease were not satisfied; (2) that there was a mutual mistake and (3) in not allowing rescission based on fraud. We do not agree.

The consent of the landlord, Cochise Enterprises, was necessary to effect an assumption of the lease by the partners. Even though the partners repudiated the contract, Nationwide got the written consent of the lessor to the assignment. Joseph Cracchiolo, the landlord's general manager, testified that he signed the consent to the assignment of the lease with the oral understanding that he would have the right to approve them as tenants after meeting them and evaluating them as business people. He knew, however, that the consent would be relied upon by the escrow agent. Mrs. Massabni did not seek to assume the lease at that time because she had repudiated the purchase. Instead, Cracchiolo did not meet the Massabnis until shortly before trial, when they were introduced by appellees' counsel who is also counsel for the landlord. At the trial, Cracchiolo speculated that he would not, three years earlier, have approved defendants as tenants when he testified:

"Q. Had you been introduced to Mr. Massabni and an army colonel's wife, and Mr. Zouheil pursuant to September of 1978 and had you been informed that they had put $22,000 cash money down to acquire the former A & W, is it your testimony that you would not have approved them as tenants?

A. That is a tough one to answer under oath. It really is. I feel I would not have. Maybe I feel like maybe I should not have and I don't believe I would."

The trial court made the following findings of fact on this issue:

" * * *

4. After Mr. Freedman, the president of Plaintiff corporation, was aware of the Defendants' refusal to close the transaction, he obtained the written approval of authorized agent, Mr. Cracchiolo, the owner of the restaurant property.

5. Mr. Freedman did not inform Mr. Cracchiolo of Defendants' refusal to close the transaction.

6. Signing the written approval by Mr. Cracchiolo was done as an accommodation to a friend (Freedman).

---

**2.** It is interesting that appellees apparently believed there was an unequivocal acceptance in writing since they withdrew their promissory note and deposited their check as called for in their offer.

7. There was a parol agreement at the time of signing the written approval that Mr. Cracchiolo would have the right to reject the Defendants as tenants after he had met and evaluated them as business people.

8. Mr. Cracchiolo would not have, on the basis of the complete lack of any experience in the restaurant business, approved the Defendants as tenants if they had attempted to go forward with the transaction.

\* \* \*"

The trial court then concluded as a matter of law:

" \* \* \*

2. The parol agreement between Mr. Freedman on the part of Plaintiff and Mr. Cracchiolo on the part of restaurant property owners, that approval by Mr. Cracchiolo was conditional, cannot be used as a defense because of the signed written agreement.

\* \* \*"

Appellees argue that Cracchiolo's testimony was not in violation of the parol evidence rule and was admissible. Assuming arguendo, that this was true, appellees do not meet the issue which appellant raised in its opening brief, to-wit, can appellees repudiate the contract before even attempting to meet a contingency and then claim that the contingency might not ever have happened. We do not believe so.

■ The contract entered into between the parties which made appellees' liability contingent on the partners' assumption of the existing lease is analogous to clauses in real estate sales agreements making the contract subject to the buyers getting financing. Such clauses are universally held to impose a duty on the buyer to make a good faith effort to fulfill the contingency. If the buyer fails to make a good faith effort he cannot rely on the contingency to avoid liability on the contract on the theory that the contract was conditional and not binding. *Sorenson v. Connelly*, 36 Colo. App. 168, 536 P.2d 328 (1975).

■ Had the partners made a good faith effort to obtain the assignment of the lease and then repudiated the contract, and had the landlord unaware of this repudiation disapproved for valid reasons the assignment of the lease, then appellant would have had no claims against appellees. The non-occurrence of the condition, approval of the assignment by the landlord, would not be excused because appellees' repudiation would not have contributed materially to its non-performance and in such a case both parties would have been discharged from the contract. See Restatement (Second) of Contracts § 255 (1981).[3]

In other words, the partners' lack of a good faith effort to secure the assignment of the lease means that its repudiation contributed materially to the fact that there was not a valid assignment, if such be the fact, and the existence of an assignment of the lease is therefore excused.

■ The contract between the parties stated that it was "[s]ubject to assumption of existing lease on premises at *present* monthly payments of $1,253.00 per month." (Emphasis added) The lease actually provided for certain guaranteed minimum rental payment and further provided:

"By March 1st of each year Lessee agrees to pay to Lessor a sum equal to seven percent (7%) of the total gross sales made in or from the premises during the previous calendar year, less the minimum guaranteed rental paid hereunder during the same calendar year."

Appellees contend that appellant never advised them as to the terms of the rent as set forth in the lease and that appellant knew of the 7 per cent gross sales requirement. Appellees then argue that there was a mutual mistake which entitled them to rescission. Appellees' contention that there was a mutual mistake is contradicted by their assertion that appellant knew of the rental terms in the lease. If there was any mistake here, it was a unilateral one. A mis-

---

**3.** Section 255 states: "Where a party's repudiation contributes materially to the non-occur-

rence of a condition of one of his duties, the non-occurrence is excused."

take of only one of the parties to a contract in the expression of his agreement or as to the subject matter does not affect its binding force and ordinarily affords no ground for its avoidance, or for relief, even in equity. *Noland Company v. Graver Tank & Manufacturing Company,* 301 F.2d 43 (4th Cir.1962); 17 C.J.S. Contracts § 143, p. 888 et seq.

█ The contract clearly referred to a written document which apparently the partners did not read. Under such circumstances they cannot claim the defense of mistake. See *Southern National Bank of Houston v. Crateo, Inc.,* 458 F.2d 688 (5th Cir.1972); *Lawrence v. Shutt,* 269 Cal. App.2d 749, 75 Cal.Rptr. 533 (1969); *Leon v. Max E. Miller & Son, Inc.,* 23 Ill.App.3d 694, 320 N.E.2d 256 (1974).

█ Appellees contend the court should have granted rescission because of the following misrepresentations. (1) The failure to inform them that they would be taking over a percentage lease; (2) the failure to inform them that there was a $5,800 lien on the fixtures, furniture and equipment and (3) the failure to inform them that substantial back rent was owed to the landlord. (This would have shown that the restaurant could not be operated profitably.)

Appellees state:

"The law is clear in this State that misrepresentation is a basis for rescission of a contract. See 17 Am.Jur.2d, Contracts, § 501."

This is the sole authority cited in appellees' brief for this proposition. In fact, the citation does not even support their position. Nowhere do appellees set forth the elements of the "misrepresentation" that will justify a rescission and how they apply to the facts in this case. We do not believe it is incumbent upon us to legally develop this point for appellees. See *Mercantile National Life Insurance Company v. Villalba,* 18 Ariz.App. 179, 501 P.2d 20 (1972). We therefore decline to consider this cross-issue.

The case is reversed and remanded to the superior court for a determination of appellant's damages, if any.

HATHAWAY and BIRDSALL, JJ., concur.