694 P.2d 290

**NATIONWIDE RESOURCES CORPORATION, Plaintiff/Appellee,**

v.

**Bertha S. MASSABNI and Fadlo Massabni, wife and husband; and Pierre M. Zouheil, Defendants/Appellants.**

**No. 2 CA–CIV 5038.**

Court of Appeals of Arizona, Division 2.

Sept. 28, 1984.

Review Denied Jan. 8, 1985.

**462**

Miller & Pitt, P.C. by W. John Thomas, Tucson, for plaintiff/appellee.

Croswell & Cornelio by Carmine Cornelio, Tucson for defendants/appellants.

## OPINION

HOWARD, Judge.

This is a garnishment action arising out of a case which we previously decided, *Nationwide Resources Corporation v. Massabni et al.*, 134 Ariz. 557, 658 P.2d 210 (1982) in which we, inter alia, awarded Nationwide court costs of $1,312.30 and attorney's fees of $33,349.29. The trial court, in accordance with the mandate, entered a judgment against the Massabnis and Pierre Zouheil, who was the other defendant in the case, in favor of Nationwide for the foregoing sums. Nationwide then served a writ of garnishment on Jerry Janke and Grace Janke, who answered that they were indebted to Pierre Zouheil and his wife, Linda, in the principal amount of $107,-400.57, evidenced by a promissory note payable to the Zouheils as husband and wife. It was the Zouheils' position in the trial court that the debt owed to them by the Jankes was community property and not subject to garnishment because Nationwide's judgment was against Pierre Zouheil only. Nationwide contended that the money owed by the Jankes was not a community asset, but the sole and separate property of Pierre Zouheil and therefore subject to Nationwide's judgment. The trial court, after a trial on the issue, found that the debt was the separate property of Pierre Zouheil and awarded judgment to Nationwide in the sum of $34,661.59. No judgment was entered against Linda Zouheil.

The Zouheils contend the trial court erred because Nationwide failed to prove that the debt was the separate property of Pierre Zouheil and not community property. We disagree and affirm.

The record shows that Pierre Zouheil was a Syrian citizen. He married Linda Zouheil in Beirut, Lebanon, in 1972. They are both Christians. They moved to Syria and lived there before moving to Morocco. In 1978. they were living in Morocco but were citizens of Syria. In 1978 they both were to come to the United States but Mrs. Zouheil had a medical problem which prevented her from traveling. Zouheil came by himself to Sierra Vista, Arizona, meeting with his friends, the Massabnis, whom he had met previously in Germany. The Massabnis and Pierre Zouheil bought a restaurant business from Nationwide Resources, which purchase became the subject of the main action involved in *Nationwide Resources Corporation v. Massabni*, supra. A few days after making the offer for the restaurant, Zouheil invested $120,-000 in a day care center in Sierra Vista owned by the Jankes. The parties signed a document stating that Pierre Zouheil invested the money to purchase a one-half interest in the business, including the land involved with the business. The document speaks of the parties as partners. A warranty deed was also made out to Pierre Zouheil, granting him a one-half interest in the realty on which the day care center was operated, as his sole and separate property. The money which Zouheil used to purchase the property and partnership interest in the day care center came from a bank account in Dresden, Germany. Zouheil deposited his Moroccan earnings in this bank account which he claimed was in both his and his wife's names.

When Mr. and Mrs. Zouheil did immigrate to Arizona in January 1980, the investments Zouheil made were in shambles. Bertha Massabni, who was supposed to buy

the restaurant from Nationwide, had decided, without consulting Pierre Zouheil, not to do so and a lawsuit had been commenced on December 1, 1978. The Jankes who were supposed to be sending monthly status reports and profits to the Zouheils in Morocco had not been doing so. Sometime after immigrating to the United States, Zouheil sued the Jankes in Cochise County Superior Court. The original complaint named Zouheil as the plaintiff but it was subsequently amended to add Mrs. Zouheil. The case was settled by the payment of $25,000 cash and the execution, on April 15, 1981, of the promissory note in issue in this case. Zouheil testified that before the case was settled he told his attorney to make his wife a co-owner of the property.

The trial court, in coming to its conclusion that the note was the separate property of Zouheil, found:

"1. At the time said defendant [Pierre Zouheil] entered in a partnership with Jerry Janke and Grace Janke, husband and wife, and acquired real property in said partnership business, he was not a resident of the state of Ariozna [sic], and

2. Said real property was acquired as his sole and separate property.

3. The partnership was dissolved as a result of an action in this court "Zouheil v. Janke", number 39179 [sic], and a stipulation therein resulting in a promissory note from defendants therein to defendant herein, Zouheil, payable to him and his wife.

4. That said note nevertheless is a separate property asset beglonging [sic] to Zouheil."

\*    \*    \*    \*    \*    \*

▆ We start with the presumption that all property acquired by either spouse during marriage is community property. *Bourne v. Lord,* 19 Ariz.App. 228, 506 P.2d 268 (1973). The promissory note was acquired by the Zouheils while they were domiciled in Arizona and it is presumptively community property. Nationwide had the burden of proving by clear and satisfactory evidence that the note was not a community asset but, instead, the separate

property of Zouheil. *Cooper v. Cooper,* 130 Ariz. 257, 653 P.2d 850 (1981). If the note was community property, it could not be garnished because Nationwide's judgment was against Zouheil only. See *Eng v. Stein,* 123 Ariz. 343, 599 P.2d 796 (1979).

▆ To prevail Nationwide, had to show that the initial investment with the Jankes in 1978 was the sole and separate property of Zouheil and that there was no transmutation of this property from separate to community. As far as transmutation is concerned, the trial court apparently disbelieved Zouheil's testimony. Beginning with this initial investment, we first note that the partnership interest was purchased with money from a bank account in Germany, in the names of both Mr. and Mrs. Zouheil, Syrian citizens and Christians living in Morocco. What did Zouheil get for his $120,000? First, he got a deed to an undivided one-half interest in real estate in Cochise County. He also got a one-half interest in a partnership. His interest in the partnership, which was to be his share of the profits and surplus, was personal property. A.R.S. § 29–226. Therefore, in exchange for the $120,000 he got both real property and personal property.

▆ The property right of the Zouheils in the partnership is personal property and is governed by the law of their matrimonial domicile at the time of its acquisition—in this case, Morocco. See *Jizmejian v. Jizmejian,* 16 Ariz.App. 270, 492 P.2d 1208 (1972), Smith, Summary of Arizona Community Property Law, Sec. 11 at pp. 18–19 (1977). The real estate, if purchased with the separate funds of Zouheil, and granted to him as his sole and separate property, would still be his separate property. See *Stephen v. Stephen,* 36 Ariz. 235, 284 Pac. 158 (1930).

▆ As can be seen, whether one considers the investment as real or personal property, the issue is resolved by determining whether the funds used to purchase the interest were the sole and separate funds of Zouheil.

■ In the trial court Nationwide contended that the Islamic law of Morocco applied and that under that law the funds used by Zouheil were his sole and separate property. The trial judge apparently agreed with this contention in awarding judgment in Nationwide's favor. On appeal we became concerned with the applicability of Islamic law to the Zouheils who were neither citizens of Morocco, nor Moslems. Since the trial court's determination of the applicable foreign law is a ruling on a question of law, Rule 44.1, Arizona Rules of Civil Procedure, we asked the parties to furnish us with materials on the issue so that we could make our own determination of the law. See *Kadota v. Hosgai*, 125 Ariz. 131, 608 P.2d 68 (1980). From the material furnished we conclude that the personal status of a Syrian couple residing in Morocco does not fall under the jurisdiction of Moroccan law. Article 13 of the Royal Decree [Dahir] of September 27, 1957, which is still in effect, states: *"Article 13* Aliens who are not Muslims are subject to their national law regarding their personal status." Michel Bourely, *Droit Public Marocain* [Moroccan Public Law] 44 (rabat, 1965) [in French].

Consequently, Article 10 of Decree 60/L.R. of March 13, 1936, as amended by Decree 146/L.R. of 1938, which is still in effect, stipulates that Syrian and Lebanese members of recognized religious communities shall be subject to the legal system of their own personal status laws in matters of personal status and to the provisions of the Civil Code in matters that do not fall under the jurisdiction of that system. Muhammad Fahr Shaqfah, *Sharh Ahkam al-Ahwal al-Shakhsiyah lil-Muslimin wa al-Nasara wa al-Yahud* [Treatise on Personal Status Provisions for Muslims, Christians and Jews] 65 (Damascus, 1973) [in Arabic].

According to Article 39 of the Law of Personal Status for the Catholic communities (Syrians and Lebanese), spouses may each keep ownership of movable and immovable properties. The Article, *Majmu'at al-Qawanin al-Lubnaniyah* [Compilation of Lebanese Laws] Section: Personal Status System of Religious Communities 1–6 (Beirut, 1973) [in Arabic], reads as follows:

*"Article 39* A married couple may each keep ownership of movable and immovable properties and the right to manage them, to benefit from them, and keep the proceeds of such worth unless they have agreed in writing to the contrary."

Immovable property must be registered in the Real Estate Register, including property of a married woman. Article 22 of Decree 188 of March 15, 1926 and its amendments, David Takriti, *ed.*, *al-Nusus al-Agariyah* [Real Estate Texts] 151 (Damascus, 1959) [in Arabic], provides the following:

*"Article 22* The transaction for registering the rights of a married woman, whose personal status forbids her personally to dispose of them, shall take place upon the request of her representative according to the provisions of her personal status."

The law also requires that any document which may establish any right to a property must be recorded in accordance with Article 34 of the above-cited law. This article reads as follows:

*"Article 34* The documents that establish real property rights, usufruct or servitude rights, their assignment, and amendment, their termination and their filing with the aim of recording them in the real property registers, must contain, in addition to the related charters and basic contracts, the following information:

1) The first and last names of the two contracting parties, their personal status, and professions

2) When necessary, the name of the husband; date of the marriage, the agreement according to which the marriage took place, date of the marriage contract, and residence of the public servant who attended it

3) The domicile of the contracting parties and the residence they have selected within the region of the Real Estate

Office if they were not resident in that region." *Id.* at 194–195.

Hence, it is obvious that the concept of community property as a result of marriage does not exist in Morocco or in Syria. Any community property must be designated as such by either one of the spouses at the time of purchasing any real property and registering the other party as co-owner. Without such registration neither the wife nor the husband has a claim against the other.

In conclusion, the wife in a Syrian Catholic marriage does not share her husband's properties, nor does she have an ownership interest in her husband's earnings unless he has specially registered part of his property to her in the public records.

There was no evidence that Zouheil did so here. Therefore, the note was Zouheil's separate property unless it was transmuted to community property.

This brings us to the question of transmutation. Separate property can be transmuted into community property by agreement, gift or commingling. *Myrland v. Myrland,* 19 Ariz.App. 498, 508 P.2d 757 (1973). The fact that the promissory note was made out to the Zouheils as husband and wife does not preclude the trial court from determining the true status of the note. Cf., *Bourne v. Lord,* supra; *Grant v. Grant,* 119 Ariz. 470, 581 P.2d 704 (App. 1978) (separate property put into joint tenancy). The alleged transmutation here was apparently by means of gift. In making proof of a transmutation of the character of property by gift the usual rules of evidence as to sufficiency apply. See *Katson v. Katson,* 43 N.M. 214, 89 P.2d 524 (1939). One of the first requirements of a valid gift is donative intent. See *Neely v. Neely,* 115 Ariz. 47, 563 P.2d 302 (App.1977). There was evidence in this case which tended to show that Zouheil never intended to give his wife any interest in the note. The deed in the day care center transaction was made out to Zouheil as his sole and separate property. Not until after the lawsuit had been filed by Nationwide did Zouheil take steps to see that his wife had an interest in the Janke transaction, the inference being that the promissory note was made out to husband and wife only to avoid any judgment in the Nationwide case and not with the intention of making the note community property. While Zouheil testified that the German bank account was in his and his wife's names, and that the deed was put in his name alone because he was told that his wife's name could not be on the deed until she came to the United States, he failed to produce any documents or witnesses to corroborate this testimony. The trial court is not bound to accept as true the uncontradicted testimony of an interested party. *Carrasco v. Carrasco,* 4 Ariz.App. 580, 422 P.2d 411 (1967). It did not do so here and we cannot say that it erred in failing to do so.

Affirmed.

BIRDSALL, C.J., and HATHAWAY, J., concur.