784 P.2d 691

**The HILL–SHAFER PARTNERSHIP, an Arizona general partnership; Daniel W. Hill and Craig Shafer, Plaintiffs Counterdefendants, Appellants Cross–Appellees,**

v.

**The CHILSON FAMILY TRUST, dated July 27, 1979 and amended April 22, 1985, Ernest Chilson and Evelyn B. Chilson, Trustees; First American Title Insurance Agency of Coconino, Inc., an Arizona corporation, Defendants Counterclaimants, Appellees Cross–Appellants.**

No. 1 CA–CIV 9452.

Court of Appeals of Arizona, Division 1, Department D.

June 29, 1989.

Petition for Review Granted in Part and Denied in Part Jan. 9, 1990.*

---

* Corcoran, J., of the Supreme Court, recused himself and did not participate in the determination of this matter.

David D. Dodge and Lewis and Roca by John P. Frank, Phoenix, for plaintiffs counterdefendants, appellants cross-appellees.

Fennemore Craig by James Powers, Rosemary J. Shockman and Loral Deatherage, Phoenix, for defendants counterclaimants, appellees cross-appellants.

## OPINION

FIDEL, Judge.

A landowner contracted to sell two of three contiguous pieces of land. At the seller's insistence, the land was contractually identified by legal description alone. This case presents the question whether the seller may avoid the sale on grounds of lack of mutual assent because the legal description that the seller supplied did not correspond to its intention. The contract described the middle and *southern* two of the seller's three pieces; the seller contends that it intended to sell the middle and *northern* pieces.

We hold that the trial court erroneously granted summary judgment to the seller. We conclude that the facts do not present a problem of lack of mutual assent, but a problem of unilateral mistake. Whether, under the circumstances, the seller may avoid the consequences of its mistake turns on disputed issues of fact and equity insusceptible to summary resolution at this stage.

## I. THE FACTS

Ernest Chilson and Evelyn Chilson are trustees of the Chilson Family Trust (Seller), which owned two adjoining parcels of land in Flagstaff, Arizona. The northern parcel was triangular in shape, and we will refer to it as "the Triangle." The southern parcel was divided by Butler Avenue into two distinct pieces, which we will refer to as "Butler North" and "Butler South."

Dioguardi, Poli & Ball, Ltd. by Michael N. Poli, Eaton, Lazarus & Dodge, Ltd. by

Triangle — 2.4 acres

Butler North — 13.0 acres

— Butler Avenue

— 4.3 acres

Butler South

Seller listed the Triangle and Butler North for long term lease. The property, posted with a sign on the north side of Butler Avenue, attracted the interest of Daniel Hill and Craig Shafer, general partners in the Hill–Shafer Partnership (Buyer). Buyer obtained a copy of an appraisal from Seller's broker, inspected the land, and submitted a letter of intent, proposing terms to purchase the listed property for the appraised value of $620,500.

Buyer's letter described the property geographically as "a fifteen acre tract ... more or less, located on the North side of Butler Avenue"; Buyer appended a legal description as well. Buyer proposed to condition the sale on its approval of a feasibility study to be completed at its own expense upon Seller's provision of a title report and survey. Because the dimensions of the tract were uncertain, Buyer also proposed a formula to adjust the price upward or downward, depending on the acreage that the survey ultimately revealed.

Seller rejected Buyer's proposal, but directed its attorneys to prepare a "take it or leave it" counter-offer at the same purchase price. Ernest Chilson, who directed negotiations for Seller, was experienced in land transactions. Chilson refused throughout negotiations to include a map as an item of the contract. He also refused to indicate the size of the land or to describe its location in lay terms by reference to nearby landmarks. He further refused to agree to a price-per-acre adjustment mechanism or to make price in any way contingent on the acreage that a survey would reveal. Instead, he insisted that the price be fixed and that the land be identified by legal description alone. For Buyer's benefit, however, he proposed to make close of escrow contingent upon Buyer's satisfaction with an economic and feasibility study that Buyer could perform at its own expense within fifteen days of Seller's provision of a survey.

Buyer ultimately assented to Seller's terms, and the parties entered a contract. The legal description in their contract, which *Seller* supplied, did not identify the Triangle and Butler North; rather, it identified Butler North and South. The questions why this change occurred and what the parties knew about it are questions of disputed fact and inference.

Ernest Chilson asserted by affidavit and in deposition that the legal description was a mistake and that he had never departed from his original intent—to transfer the Triangle and Butler North and to retain Butler South. He said that the mistake had originated in one of a pair of earlier deeds, prepared by a title company, by which the Chilsons had transferred the three pieces of property to the Chilson

Family Trust. Chilson acknowledged that it was obvious with hindsight that the legal description in question applied to Butler North and South (the description refers to an easement for a strip of land 88 feet in width; the easement provides for Butler Avenue). He claimed, however, to have borrowed the description from one of the earlier deeds under the mistaken assumption that it described the Triangle and Butler North.

Buyer disputes Chilson's account and suggests an alternative theory of Seller's conduct. We need not elaborate, however, for Buyer asserts, and we agree, that even if we accept Chilson's account as accurate for purposes of decision, the remaining evidence, taken in a light most favorable to Buyer, precludes summary judgment for Seller.

Buyer's attitude at the time of signing was described by Craig Shafer in deposition. Shafer acknowledged that Buyer had originally offered to purchase the Triangle and Butler North, but added, "The entire posture of the deal had changed. The counter that they came back with did not describe the property in any way, shape, or form, except for the legal description." He continued:

> We assumed that when we signed the contract ...—we were purchasing from—obviously purchasing property from Mr. Chilson in the Butler Avenue area. We did not know at that time how much property there was or what the actual location of the property was, even though we had asked that they describe the property to us and we had asked for maps and we had asked for representations of the seller. For reasons unknown to us, the seller chose not to disclose any of this information, and the only thing that we were given was the legal description. And I remember I was very, very concerned about this, and I called Dan [Hill] and I said, "Dan, they're not going to represent the property in any way, shape or form except for the legal description."

Shafer explained, however, as did Hill, that Buyer had accepted the uncertainty of pur-

chasing whatever land the legal description described because the contract provided Buyer a backout option after receipt of Seller's survey.

Seller disputes the accuracy of Buyer's account and cites other evidence from which a factfinder could conclude that Buyer, before signing the contract, recognized that the legal description referred to Butler North and South. Seller concedes, however, that Buyer's account must be accepted as accurate for the purpose of our review of summary judgment.

Before the close of escrow, Seller refused to complete the sale, claiming that the contract misidentified the land. Instead, Seller tendered an amended purchase agreement describing the Triangle and Butler North. When Buyer refused to sign it, Seller cancelled the escrow.

Butler South exceeds the Triangle in size and provides Butler Avenue frontage. From these facts and from the Seller's effort to avoid and the Buyer's effort to enforce the sale, it is apparent that Butler South exceeds the Triangle in value.

Buyer initiated legal proceedings with a suit for specific performance for the sale of Butler North and South. Seller answered that the original contract was the product either of mutual mistake or of Buyer's wrongful conduct and was void for lack of mutual assent. Seller also counterclaimed for quiet title and damages, alleging fraudulent concealment and racketeering. The trial court disposed of the case on cross-motions for summary judgment, granting Buyer judgment against Seller's fraud and racketeering claims, granting Seller judgment against Buyer's specific performance claim, granting Seller quiet title, and awarding Seller a portion of its attorney fees.

Buyer appeals from the dismissal of its claim for specific performance. Seller cross-appeals only from what it regards as an inadequate attorney's fee award. Because we rule that summary judgment was improperly entered against Buyer and, in vacating that judgment, also vacate Seller's attorney's fee award, we need not reach

the issue presented by Seller's cross-appeal.

## II. THE LAW

### A. *Mutual Assent*

Buyer contends that the parties entered a valid and enforceable contract for the conveyance of whatever land the legal description described. Seller argues for purposes of summary judgment that, whatever meaning Buyer attributed to the legal description, Seller attributed a materially different, albeit mistaken, meaning—that it described the Triangle and Butler North. Because the parties attached materially different meanings to their agreement, according to Seller, the contract is void for lack of manifestation of mutual assent.

A bargain is made, according to the Restatement, by "manifestation of mutual assent to the exchange and a consideration." Restatement (Second) of Contracts § 17 (1979). Section 20, invoked by Seller, describes the effect of misunderstanding on the manifestation of mutual assent:

(1) There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and

(a) neither party knows or has reason to know the meaning attached by the other; or

(b) each party knows or each party has reason to know the meaning attached by the other.

(2) The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if

(a) that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party; or

(b) that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.

Restatement (Second) of Contracts § 20 (1979), applied in *Buckmaster v. Dent*, 146 Ariz. 521, 707 P.2d 319 (App.1985).

The law is phrased deliberately in terms of the meanings that the parties attach to their *manifestations*. "[A] mental reservation of a party to a bargain does not impair the obligation he purports to undertake." Comment c to Restatement (Second) of Contracts § 17. Accord, *Nationwide Resources Corp. v. Massabni*, 134 Ariz. 557, 563, 658 P.2d 210, 216 (App. 1982). Of the two subsections of section 20, the first describes the circumstances under which the parties' misunderstanding of the meaning of their manifestations prevents formation of an enforceable bargain; the second describes the circumstances under which the bargain is enforceable in accordance with the meaning that one party has attached.

■ Seller argues that, by application of subsection 1, we should conclude that the parties' misunderstanding prevented formation of a contract. We disagree. The Reporter's Note to § 20 states,

A contract should be held nonexistent under this Section only when the misunderstanding goes to conflicting and irreconcilable meanings of a material term that could have either but not both meanings.

Williston similarly summarizes the law when he states that "where a phrase of a contract ... is reasonably capable of different interpretations ... there is no contract." 1 S. Williston, Contracts § 95 (3d ed. 1957).

A famous illustration of this principle is *Raffles v. Wichelhaus*, 2 Hurl. & C. 906, 159 Eng.Rep. 375 (Ex.1864). A buyer and seller contracted for the exchange of goods to be shipped from Bombay by the steamer Peerless. There were two steamers of the name "Peerless" sailing from Bombay at materially different times; each party had a different "Peerless" in mind. The term "Peerless" had conflicting and irreconcilable meanings. No contract was formed.

A more recent illustration is *Buckmaster v. Dent*, 146 Ariz. 521, 707 P.2d 319 (App. 1985). The parties contracted for the sale of a trailer park, ten acres of undeveloped land to its east, and a private entrance street, the only source of access to the

park. The buyer agreed to purchase subject to "an easement for ingress and egress over the Entrance Street, and other exceptions that appear of record and do not impair the value of the Real Property...." *Id.* at 522, 707 P.2d at 320. The seller at all times intended by provision for an easement to preserve access over the entrance street for property the seller retained to the west of the park. At an intermission in the negotiations, however, the seller granted and recorded an easement over the entrance street for property owned by others to the south of the park. The misunderstanding materialized after the contract had been signed. The buyer argued that he had acceded to just one easement. The seller argued that the buyer had acceded to two, contending that the western property had always been intended as the beneficiary of the language, "an easement for ingress and egress over the Entrance Street," and that the recorded easement for the southern properties was covered by the language, "and other exceptions that appear of record...." *Id.* The dispute was significant because, if the entrance road were subject to two easements, the resulting traffic would lead the city to deny the buyer a permit to expand the park into the eastern undeveloped land.

In these circumstances, Division 2 of our court upheld rescission, stating:

Since neither party knew or had reason to know the meaning intended by the other, there was no 'meeting of the minds' as to an essential term of the contract. Restatement (Second) of Contracts § 20 (1979). The situation that existed here is similar to that in *Heywood v. Ziol*, 91 Ariz. 309, 372 P.2d 200 (1962), in which the court noted the facts showed two unilateral mistakes existed since each party was laboring under a different interpretation of the legal effect of the contract provision in dispute.

*Buckmaster*, 146 Ariz. at 523, 707 P.2d at 321.

A third illustration is provided by *Konic Int'l Corp. v. Spokane Computer Serv., Inc.*, 109 Idaho 527, 708 P.2d 932 (App. 1985). There the parties contracted for the sale of certain computer devices at the price of "fifty-six twenty." The seller meant $5,620. The buyer meant $56.20. The phrase "fifty-six twenty" was "reasonably capable of [both] interpretations," Williston, *supra.* No contract was formed.

In *Raffles, Buckmaster,* and *Konic,* the parties' "misunderstanding [had] its source 'in the ambivalence or double meaning ... of an expression.'" Reporter's Note, Restatement § 20, quoting Young, *Equivocation in the Making of Agreements,* 64 Colum.L.Rev. 619, 646 (1964). This case is far different. The legal description supplied by Seller had no "ambivalence or double meaning." It precisely and exactly described the properties at Butler North and Butler South, with an easement for Butler Avenue in between. By no permissible construction did it include the Triangle or exclude Butler South. If it was understood to do so by Seller, that misunderstanding had its source not in any vagueness or imprecision of the description. Indeed, though the interpretation of a legal description requires specialized knowledge and reference to official plats, its very efficacy is that no more precise description can be devised. Chilson himself acknowledged in deposition that he had insisted on contracting on the basis of legal description alone because he believes it "the only accurate way to describe a piece of property." The source of Seller's misunderstanding was not vagueness of the description but rather the Seller's unilateral failure to take the necessary interpretative measures to make certain what was conveyed by the legal description that Seller supplied.

■ This same reasoning disposes of a secondary argument by Seller. Seller argues that, even if both parties manifested an intent to transfer "whatever the legal description described," this meaning was too indefinite to accomplish an enforceable purchase agreement. We disagree. The Restatement requires only that a term be adequately precise to convey "a core of common meaning sufficient [for the parties] to determine their performances with reasonable certainty or to give a reasonably certain basis for an appropriate legal

remedy." Comment b, Restatement (Second) of Contracts § 20. *See also* § 33. There was nothing indefinite about the legal description of the land Seller contracted to exchange. If the legal description that Seller supplied miscorresponded with Seller's intent, the reason did not lie in semantic imprecision but rather in Seller's choice of the wrong description.

We have rejected Seller's argument that the contract is voidable under Restatement (Second) of Contracts § 20(1). We turn to Seller's argument that it is voidable under § 20(2). Seller argues that, even if the touchstone of avoidance under § 20(1) is the ambiguity or double-meaning of an essential term, the application of § 20(2) is not similarly constrained. The word "horse," Seller points out, is not susceptible to meaning "cow;" yet illustration 5 to subsection 2 provides:

A says to B, "I offer to sell you my horse for $100." B, knowing that A intends to offer to sell his cow for that price, not his horse, and that the word "horse" was a slip of the tongue, replies, "I accept." The price is a fair one for either the horse or the cow. There is a contract for the sale of the cow and not of the horse. If B makes the contract with the undisclosed intention of not performing it, it is voidable by A for misrepresentation. *See* Sections 159–65.

Analogizing its mistaken legal description to A's slip of the tongue, Seller argues that § 20(2) permits it to avoid the consequence of its mistake.

If this analogy were valid, not only might Seller be relieved of selling the "horse" of Butler North and South; Seller might successfully have counterclaimed—though it did not attempt to do so—for specific performance to force Buyer to accept the "cow" of Triangle and Butler North.[1]

We do not, however, find illustration 5 determinative in Seller's favor. First, Buy-er's conduct must be contrasted with that of B. B recognizes A's mistake, but assents, seeking unfair advantage. The facts are different in the present case. Here, because we are reviewing summary judgment, we must accept the truth of Hill's and Shafer's testimony that they were ultimately willing to contract for whatever land the legal description described, not knowing at the moment of contract precisely what Seller meant to deliver thereby, but content with their backout option following survey and feasibility study.

While we thus conclude that a disputed question of material fact precluded summary judgment on the theory that the Buyer sought inequitable advantage from Seller's mistake, if this factual dispute were the only point of distinction, illustration 5 might yet support a factfinder's verdict for Seller upon remand.

A second distinction, however, renders the illustration inapplicable: In our view, Seller's conduct is not comparable to that of A. Illustration 5 concerns a mere slip of the tongue in the course of a simple oral exchange. This case concerns a draftsman's selection of an erroneous legal description to depict the subject of a written contract for the sale of land. Seller not only supplied the erroneous description; Seller did so after detailed negotiations, throughout which Seller insisted that the property be described by legal description alone, refusing Buyer's request that it be cross-depicted by other means. Seller further drafted the contract, gave Buyer an escape clause following completion of a survey, and provided no escape clause for itself.

To benefit from § 20(2) of the Restatement, Seller would have to demonstrate that it had "no reason to know of any different meaning attached by the [Buyer]" to Seller's manifestation of a willingness to sell whatever its legal description described. The concept "reason to know" is defined in the Restatement:

---

**1.** Illustration 5 carries forward illustration 2 to § 71 of the first Restatement of Contracts. However, the two restatements draw a different conclusion from the same facts: "The Comment in former § 71 concluded that there was no contract for either the cow or the horse; the conclusion [in § 20] is based upon Subsection (2), which holds B to his knowledge that A means the cow." Reporter's Note, Restatement (Second) of Contracts, § 20.

A person has reason to know a fact, present or future, if he has information from which a person of ordinary intelligence would infer that the fact in question does or will exist. A person of superior intelligence has reason to know a fact if he has information from which a person of his intelligence would draw the inference. There is also reason to know if the inference would be that there is such a substantial chance of the existence of the fact that, if exercising reasonable care with reference to the matter in question, the person would predicate his action upon the assumption of its possible existence.

Reason to know is to be distinguished from knowledge and from "should know." Knowledge means conscious belief in the truth of a fact; reason to know need not be conscious. "Should know" imports a duty to others to ascertain facts; *the words "reason to know" are used* both *where the actor* has a duty to another and where he *would not be acting adequately in the protection of his own interests were he not acting with reference to the facts which he has reason to know.*

Restatement (Second) of Contracts, § 19, Comment b (emphasis added).

Under the circumstances of this case, we conclude as a matter of law that Seller, "acting adequately in the protection of [its] own interests," had reason to know that Buyer, when presented Seller's offer, could reasonably have construed it as a Buyer's option, following survey and feasibility study, to hold Seller to the sale of whatever land the legal description described.

We conclude that Restatement (Second) of Contracts § 20 is inapplicable to this case. This is not to say that Seller lacks possibility of recourse or that Seller is foreclosed from attempting to prove that Buyer seeks inequitable advantage from Seller's mistake. Arizona holds, in accordance with the Restatement,

The mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude either *avoidance or reformation.*

*Marana Unified School v. Aetna Cas. & Sur. Co.,* 144 Ariz. 159, 165, 696 P.2d 711, 717 (App.1984) quoting Restatement (Second) of Contracts § 157, Comment a. *See also Howell v. Waters,* 82 N.C.App. 481, 347 S.E.2d 65 (1986). Seller's recourse, however, if any, must be sought by reference to the law of unilateral mistake.

### B. *Unilateral Mistake*

The burdens of a party seeking to avoid the contractual consequences of a unilateral mistake are set forth in §§ 153 and 154 of the Restatement (Second):

§ 153. *When Mistake of One Party Makes a Contract Voidable*

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

§ 154. *When a Party Bears the Risk of a Mistake*

A party bears the risk of a mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

We note that the question posed in § 154—whether Seller bears the risk of its mistake—is multifaceted. Had Seller supplied a correct legal description of the Triangle and Butler North, for example, Seller would clearly have been allocated the risk by agreement that the acreage would prove larger and more valuable by survey than visual inspection had led Seller to expect.

Seller assumed at least this risk by providing Buyer an exit option after survey while retaining no exit for itself. But did Seller also undertake the risk of supplying a mistaken legal description, only partially inclusive of the land it had originally intended to convey, but additionally inclusive of more valuable land it had intended to retain? That is a slightly different question, and it must be answered in this case.

This latter question, like the former, may be capable of resolution by the trial court as a matter of law. Cf. *Howell v. Waters*, 82 N.C.App. 481, 347 S.E.2d 65 (1986) (land conveyed by written purchase agreement was of lesser dimensions than the land the buyer expected to receive; it could not be determined as a matter of law that the buyer bore this risk, given evidence that the borders of the land were misrepresented by the seller's agent). However, because the question was not raised before the trial court in the original round of motions for summary judgment, we do not address it at this time.

■ The remaining questions—whether enforcement of the contract would be unconscionable and whether the Buyer had reason to know of the Seller's mistake—are clearly matters for a factfinder's judgment and are inappropriate for summary resolution at this stage.

## III. CONCLUSION

For the reasons we have given, we set aside the trial court's grant of summary judgment and attorney's fees in Seller's favor and remand this case to the trial court for further proceedings consistent with this opinion. We award no attorney's fees for the appeal, leaving the entire question of fees to abide the outcome.

CONTRERAS, Acting P.J., and CORCORAN, J., concur.

NOTE: The Honorable Robert J. Corcoran, Justice of the Arizona Supreme Court, has been authorized by Administrative Order No. 89-3 of the Chief Justice, to participate in the resolution of this case which was previously assigned to him as a judge of this Court or to his department before Thursday, January 5, 1989.