880 P.2d 1109

**CHASE BANK OF ARIZONA, an Arizona corporation, successor to Continental Bank, Plaintiff, Counterdefendant–Appellee, Cross–Appellant,**

v.

**Joe ACOSTA and Aurora Acosta, husband and wife, Defendants, Counterclaimants–Appellants, Cross–Appellees.**

No. 1 CA–CV 91–0093.

Court of Appeals of Arizona, Division 1, Department B.

Feb. 3, 1994.

Review Granted on issue B and Denied on other issues Oct. 4, 1994.

Streich Lang, P.A. by William S. Hawgood, II, Timothy Thomason and Leigh Lani Brown, Phoenix, for plaintiff, counterdefendant-appellee, cross-appellant.

Stewart & McLean, Ltd. by Harry A. Stewart, Jr. and William H. McLean, Phoenix, for defendants, counterclaimants-appellants, cross-appellees.

## OPINION

JACOBSON, Presiding Judge.

The trial court granted summary judgment in favor of the plaintiff bank foreclosing a real property mortgage given by a limited partnership and granting a deficiency judgment against appellants, Joe and Aurora Acosta. Appellants, a general partner in the limited partnership and his wife (hereafter,

collectively "Acosta"), appeal from the deficiency judgment entered against them. The bank cross-appeals from the court's award of its attorneys' fees in an amount less than requested.

## FACTS

We view the facts in the light most favorable to appellants, the parties against whom summary judgment was entered. *Gordinier v. Aetna Casualty & Sur. Co.*, 154 Ariz. 266, 267, 742 P.2d 277, 278 (1987). In 1984, Edwin Grant, his brother-in-law Walter Barr, and Joe Acosta formed the Meadowbrook Equity Partners Limited One Partnership (Meadowbrook) to purchase commercial realty in Phoenix for $2,160,000. Grant, a real estate syndicator, asked Acosta, a certified public accountant who had performed services for Grant, to become a Meadowbrook general partner. Acosta agreed, although he did not take an active part in the transaction, and he further agreed that Grant would have authority to act as the managing general partner.

The realty consisted of three parcels. At the time of the purchase, parcels one and two were leased to "Grandinetti's" restaurant. (Parcels one and two will be referred to as "the restaurant parcel.") Parcel three contained the Meadowbrook apartments ("the apartment parcel").

Grant had already arranged with Continental Bank to finance the purchase before Acosta became involved in the partnership. Grant, Continental, and the escrow company advised Acosta that Continental would finance the project if Continental could obtain a first mortgage on the property, which was already encumbered by several other liens, and if the general partners personally guaranteed the loan. In a June 7, 1984, letter to Grant, Continental set out the proposed terms of the loan:

> Continental Bank's Senior Loan Committee will consider a first mortgage loan on the referenced properties with the following general terms and conditions:
>
> . . . .
>
> GUARANTEE: Personal guaranties will be required from the general partners;

Edwin H. Grant, Jr., Walter Barr, Gary Snapp, and Joe Acosta.

. . . .

> CLOSING REQUIREMENTS: Closing will require satisfactory Promissory Note and Mortgage, Partnership Agreement . . ., and ALTA title insurance policy insuring Lenders First Lien all in form and content satisfactory to Continental Bank. . . .

Grant, as managing general partner, signed the letter accepting these terms on June 12, 1984. On June 14, 1984, Continental approved the loan and an escrow was opened, with the provision that Continental receive a first mortgage and first lien on the property and an ALTA title policy.

On August 29, 1984, on behalf of the partnership, Grant then executed a promissory note for $1,620,000 and a mortgage on the property, to secure the note. The note called for monthly payments of accrued interest at 2% above Continental's prime rate, with the principal balance falling due on September 1, 1986. Upon default, the interest on the principal would be 25% per annum.

The mortgage required the loan to be secured by a first lien on the mortgaged property:

> . . . Mortgagor hereby covenants and agrees with said mortgagee as follows:
>
> 1. The mortgagor is well seized, in fee simple, of the premises described above and has full right, power and lawful authority to grant, bargain, sell and convey the same, and the same is free and clear of all liens and encumbrances . . ., and the Mortgagor shall and will warrant and forever defend the Mortgagee herein in the quiet and peaceful possession of the said premises against all and every person lawfully claiming or to claim the whole or any part thereof; with the sole exception of the holder of this mortgage. . . .

Acosta and the other general partners each signed "Unconditional Guarant[ies]" for the payment of the loan. Acosta testified he signed the guaranty as a favor to Grant because he believed that the note would be secured by a first lien on all the property based on Grant's and Continental's represen-

tations and the escrow provisions. He received no money, benefit, or any consideration for signing the guaranty.

Acosta's wife, Aurora Acosta, did not sign the guaranty, and allegedly had no knowledge of either the guaranty or the entire transaction. She averred in an affidavit that, had she been asked, she would have refused to sign the guaranty.

On August 31, 1984, the bank disbursed $800,000 to the escrow company for Meadowbrook's purchase of the restaurant parcel. The bank obtained a first lien position with respect to this parcel.

The same is not true of the apartment parcel. Continental received a title report in August 1984, showing that the apartment property was encumbered by additional senior liens. Included was an agreement for sale between Joe M. Ross, as seller, and Phoenix Capital Growth Investors (PCGI), as buyer ("the Ross lien"). Also included was a purchase money deed of trust in favor of PCGI arising out of its subsequent sale of the apartment property to Meadowbrook ("the PCGI lien"). Meadowbrook and its agents paid off other prior liens.

Continental and Grant attempted to resolve the remaining lien priority problems. Without Acosta's knowledge, Continental agreed to a plan proffered by William Allen, a mortgage broker who worked with Grant.[1] Under the plan, Continental would disburse money from the loan for Grant and Allen to purchase in their own names the outstanding liens on the apartment parcel at a total discount of more than $150,000. Grant and Allen would then assign those liens to Continental to enable it to attain seniority, rather than closing the purchase through a title company to pay off the prior liens in full as was done for the restaurant parcel.[2]

Grant and Allen negotiated the purchase of the Ross lien for $300,000. On February 15, 1985, Continental disbursed that amount from the loan to Grant and Allen. Allen paid Ross and Ross assigned his interest to Allen; the assignment was recorded. Allen then reassigned this interest to Continental on February 17, 1985, but Grant requested the bank not to record this assignment, pending Grant's and Allen's efforts to also resolve the PCGI lien problem. Continental agreed and did not record the assignment from Allen.

Grant contracted with PCGI to purchase the property for $1,335,000 by paying PCGI a down payment, assuming an existing encumbrance, and giving PCGI a carry-back note and deed of trust for the balance.

Pursuant to the plan, Continental disbursed the balance of the loan proceeds, over $800,000, to Grant and Allen to purchase the outstanding liens on the apartment parcel.[3] However, Grant and Allen did not use the loan funds to resolve the problem with the Ross lien; additionally, they made a second assignment of the Ross lien to Gilbert and Sullivan Mortgage Company (G & S) in exchange for a $440,000 loan to purchase property in Sedona.[4] G & S immediately recorded the assigned Ross lien, putting G & S ahead of Continental because of the latter's failure to record the assignment from Allen to it.[5]

The failure to record the Allen assignment of the Ross lien to Continental also allowed the PCGI lien to take priority. The bank conceded that all the loan proceeds were distributed without accomplishing a payoff and release of the prior liens against the apartment property. Thus, the total encumbrances on the apartment parcel far exceeded the total value of all the property and the amount of the loan Acosta guaranteed.

The note went into default when Meadowbrook failed to pay any interest beginning with the February 1, 1986, payment, or the

---

1. Grant provided the bank with a letter outlining Allen's authority to accept and utilize the loan funds on behalf of the Meadowbrook partnership.

2. The potential breach of fiduciary duty owed to Acosta by Grant is not an issue in this case. *See Rhue v. Dawson,* 173 Ariz. 220, 841 P.2d 215 (App.1992).

3. Continental also paid Allen $20,000 for his services in devising and executing the plan.

4. *See* note 2, *supra.*

5. *See Blalak v. Mid Valley Transp., Inc.,* 175 Ariz. 538, 858 P.2d 683 (App.1993).

principal balance, which became due on September 1, 1986.

On October 1, 1986, Chase Bank of Arizona acquired Continental and its assets and became the holder and owner of the Meadowbrook promissory note, the mortgage, and the guaranties. We will refer to Continental and/or Chase simply as "the bank."

In late 1986 or early 1987, PCGI began non-judicial foreclosure of its deed of trust, and the bank commenced judicial foreclosure proceedings on all of the property.

## PROCEDURAL HISTORY

The bank filed a complaint against the Meadowbrook partnership on November 21, 1986, seeking to judicially foreclose the mortgage. It also named Edwin H. and Barbara Grant, Walter and Kathleen Barr, and Joe and Aurora Acosta, seeking judgment for the principal balance due on the note, $1,618,-728.02, plus interest, costs, and attorneys' fees. The court appointed a receiver on December 4, 1986, to take possession of the apartments, to manage them, and to collect rents.

The bank moved for summary judgment on October 5, 1987. The Grants then filed for bankruptcy and filed an involuntary bankruptcy petition against the partnership, staying this suit. The bank's case was dismissed without prejudice for failure to prosecute on October 13, 1988.

On December 5, 1988, the bank filed a complaint in the Grants' bankruptcy case, seeking judgment for the balance due on the note and to have the debt determined nondischargeable because of Grant's alleged fraud and misappropriation of the loan proceeds. In both bankruptcy cases, the bank requested relief from the automatic stay. On January 5, 1989, the bankruptcy court terminated the stays with respect to the mortgaged property effective January 24, 1989, to allow the bank to proceed with foreclosure.[6]

The bank then moved to set aside the dismissal of its foreclosure case. Without objection from Acosta, the court granted the motion and reinstated the case on June 6, 1989. The bank then reurged its motion for summary judgment.

Acosta filed a counterclaim against the bank for breach of contract and negligence arising out of alleged improper disbursement of the loan proceeds. Acosta claimed damages as a result of the bank's failure to obtain a first lien on the apartment parcel and its "intentional failure to record an assignment of a prior encumbrance, which impaired the collateral and affected Acosta's liability as a partner and as a guarantor of the loan." The bank moved for summary judgment on the counterclaim. Acosta then moved to amend the answer, without objection from the bank, to include affirmative defenses and offsets for the bank's negligence, breach of contract, and breach of fiduciary duty, as stated in the counterclaim.

The court granted partial summary judgment for the bank on August 24, 1989. The court found that the partners' marital communities were liable for the partnership's debt, and held that judgment could be entered against the individual partners even though the partnership was still in bankruptcy. The court also held that the bank could foreclose on the property and then obtain a deficiency judgment against the individual partners.

Subsequently, the court granted summary judgment to the bank on the Acostas' counterclaim, finding that the bank had no contractual duty to obtain a first lien on the mortgaged property, and that Acosta was unconditionally liable under his guaranty for the amount due on the note regardless of the bank's conduct. The bank then filed a request for attorneys' fees. Acosta filed an objection to the fee request and to the form of judgment submitted by the bank.

After commencing this action, the bank acquired the deed of trust from PCGI and the Ross lien from G & S, restoring the bank to a first lien position against the apartment parcel. The bank then exercised the forfeiture rights under the Ross lien and credited

---

**6.** Acosta filed adversary complaints in bankruptcy proceedings against the restaurant lessee and the court-appointed receiver, asserting they misused or mismanaged the property, affecting his liability to the bank as partner and guarantor. These matters were still pending at the time this appeal was filed.

the appraised value of the apartment property against its judgment, reducing the deficiency remaining after the property was sold.

Formal judgment was entered on November 15, 1990. Acosta moved for a new trial or for modification of the judgment, but withdrew the motion on December 13 and filed a notice of appeal on the same day.[7] The bank filed a notice of cross-appeal on December 31, 1990. We have jurisdiction pursuant to A.R.S. § 12–2101(B).

## ISSUES

1. Is the bank obligated to exhaust its remedies against the partnership as a condition to establishing the personal liability of a partner for a deficiency judgment?
2. Was the judgment properly entered against the Acostas even though the Meadowbrook partnership had filed for bankruptcy?
3. Is the Acosta marital community liable for any indebtedness of Acosta as a partner of the Meadowbrook partnership?
4. Could the bank properly seek a deficiency judgment for the unpaid portion of the debt even though it judicially foreclosed on less than all the property covered by the mortgage given to secure the note?

## CROSS–APPEAL ISSUES

5. Did the trial court abuse its discretion by failing to award attorneys' fees that the bank incurred for services of prior counsel in the foreclosure proceedings?
6. Did the trial court properly deny the bank an award of attorneys' fees and costs incurred in connection with the partnership bankruptcy proceedings?

## DISCUSSION

**I. Is the bank obligated to exhaust its remedies against the partnership as a condition to establishing the personal liability of a partner for a deficiency judgment?**

Acosta notes that the bankruptcy court lifted the stay in the partnership's bankruptcy only to the extent of allowing the foreclosure action to proceed but did not allow the bank to obtain a personal judgment against the partnership. Acosta argues that the bank must proceed against the partnership to obtain this personal judgment before the bank can proceed against him to determine his "derivative" liability. He argues that the liability of a general partner is vicarious and ancillary to that of the principal and that, if the partnership is not liable, neither is the general partner. Thus, he concludes, to obtain judgment against the partner, the bank must first proceed against the partnership, or at least do so concurrently. Acosta argues that *Springer v. Bank of Douglas,* 82 Ariz. 329, 313 P.2d 399 (1957), requires us to hold that the bank must proceed first against the partnership before proceeding against him. Under *Stewart v. Underwood,* 146 Ariz. 145, 704 P.2d 275 (App.1985), he maintains, the judgment against him violates the bankruptcy automatic stay.

■ In *Stewart v. Underwood,* we held that "Underwood's discharge in bankruptcy did not extinguish the debt, but only barred subsequent actions against him personally." *Id.* at 148–49, 704 P.2d at 278–79. It followed that the plaintiff could only foreclose on the security and could not obtain a personal judgment against the discharged debtor. *Id.* at 149, 704 P.2d at 279. *Stewart v. Underwood* does not apply here because Acosta is not in bankruptcy and, in Arizona, a creditor can proceed against a general partner independently of any proceeding against the partnership.

In Arizona, contrary to the common law, a general partner's liability for a partnership debt is joint and several. A.R.S. § 29–215;[8] *Catalina Mortgage Co. v. Monier,* 166 Ariz. 71, 800 P.2d 574 (1990); *see also* A.R.S. § 44–141(A).[9] The supreme court rejected a similar argument in *Catalina Mortgage;* citing A.R.S. §§ 29–215 and 44–141, the court stated:

> partnership; but any partner may enter into a separate obligation to perform a partnership contract."

---

7. Neither the partnership nor the other partners appealed.

8. A.R.S. § 29–215 states: "All partners are liable jointly and severally for everything chargeable to the partnership under §§ 29–213 and 29–214, and for all other debts and obligations of the

9. A.R.S. § 44–141(A) states:
  All parties to a joint obligation, including negotiable paper and partnership debts, shall

Given these statutes, we cannot accept Monier's proposition that *Springer* adopts a rule of only joint liability. . . .

Because Arizona statutory law had imposed joint and several liability for partnership debts for more than forty years before *Springer* was decided, we cannot agree that without discussion or analysis, the case stands for the binding proposition that, despite two statutes to the contrary, this state follows the common law rule or the language of A.R.S. § 29–215 implies as much.

166 Ariz. at 74, 800 P.2d at 577 (citation and footnote omitted). Because the general partner's liability is both joint and several, a creditor may proceed against an individual partner without proceeding against, or exhausting the assets of, the partnership. *Id.* at 75, 800 P.2d at 578; *Malisewski v. Singer,* 123 Ariz. 195, 197, 598 P.2d 1014, 1016 (App. 1979); *see also Head v. Henry Tyler Constr. Corp.,* 539 So.2d 196, 199 (Ala.1988) (reasoning adopted by the court in *Catalina Mortgage* ).

Acosta cites *Faber v. Althoff,* 168 Ariz. 213, 812 P.2d 1031 (App.1990), for the proposition that a partner has no derivative liability for a deficiency judgment unless the partnership has such liability. *Faber* does not hold that a plaintiff must first proceed against the partnership before it can proceed against an individual partner. Rather, *Faber* follows both § 29–215 and *Catalina Mortgage* in noting that the plaintiff need not concurrently proceed against all the partners:

If partners are both jointly and severally liable, they may be sued in successive actions for the same claim. *Malisewski v. Singer,* 123 Ariz. 195, 598 P.2d 1014 (App. 1979). . . . [T]he generally recognized rule that applies when an injured person recov-

ers judgment against one of several co-obligors [is that] a judgment in favor of one does not terminate a claim against another one. *See Restatement (Second) of Judgments* § 49. . . .

.     .     .     .     .

We therefore find no impediment to plaintiff's proceeding in a separate action against the individual partners to recover the deficiency remaining on a partnership liability *for the full amount of a debt that was adjudicated in plaintiff's favor in the foreclosure action.*

*Id.* at 220–21, 812 P.2d at 1038–39.

■   Applying these principles to this case, we conclude that the stay of proceedings in the partnership's bankruptcy action does not apply to bar proceedings against Acosta as a general partner. *In re Old Orchard Investment Co.,* 31 B.R. 599, 602–03 (W.D.Mich. 1983), contrary to Acosta's assertion, does not hold that the automatic stay in a partnership's bankruptcy enjoins action against an individual general partner. In that case, the court enjoined an action against the individual partner because the partner's assets might have provided a fund out of which the partnership's creditors might receive satisfaction of their debts. *Id.* at 601. However, the basis of the injunction was not the automatic stay but 11 U.S.C. § 105, which provides: "The bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." If Acosta desired relief under that provision, he should have sought it in bankruptcy court.

*In re Aboussie Brothers Construction Co.,* 8 B.R. 302 (E.D.Mo.1981), is more on point. The court noted, "It is generally accepted that, for bankruptcy purposes, a partnership is a separate and distinct entity from its partners." *Id.* at 303, *citing Liberty Nat'l Bank v. Bear,* 276 U.S. 215, 48 S.Ct. 252, 72 L.Ed. 536 (1928). Because in Arizona a partner is jointly and severally liable, we agree

be severally liable also for the full amount of such obligations. An action may be brought against such parties jointly or separately, joining one or more, and judgment may be given in each such action without barring an action

against any party to the obligation not included in the judgment, and without releasing any party against whom the action was not brought.

that, absent other compelling circumstances, there is "no reason why the distinct existence of the partnership and its partners should be disregarded in the instant context." *Id.*

Acosta argues that the above analysis misses the point. He asserts that the bank's election to pursue a judicial foreclosure and obtain a deficiency judgment constituted a waiver of its right to sue on the note. He argues that this is mandated by A.R.S. § 33–722, which provides: "If separate actions are brought on the debt and to foreclose the mortgage given to secure it, the plaintiff shall elect which to prosecute and the other shall be dismissed." Acosta's argument misconstrues this statute, as we have previously held:

> We also reject defendants' final argument that allowing a plaintiff to seek to collect a deficiency after the foreclosure sale would violate the statutory requirement that the plaintiff must make an election of remedies. *See* A.R.S. § 33–722. That requirement merely prohibits "separate actions ... brought on the debt and to foreclose the mortgage" simultaneously, which would result in a potential double recovery. *See Bank of Douglas v. Neel,* 30 Ariz. 375, 247 P. 132 (1926). However, where liability for the full amount of the debt has been established in one foreclosure action, and a plaintiff seeks to collect that amount against a defendant's personal assets after the property has been sold, the plaintiff has not brought "separate actions," but has elected in the single foreclosure action to apply the security promised against the debt secured and, should that security fail to satisfy the debt, seek payment from other sources.... In such a case, the statutory requirement that a plaintiff elect between an action on the debt or an action to foreclose simply does not apply.

*Faber v. Althoff,* 168 Ariz. at 220, 812 P.2d at 1038 (citations omitted). *See also Mid Kansas Fed. Sav. & Loan Ass'n v. Dynamic Dev. Corp.,* 167 Ariz. 122, 804 P.2d 1310 (1991) (A.R.S. § 33–722 does not apply to non-judicial foreclosure by trustee's sale).

■ Acosta's argument misconstrues the nature of a foreclosure action in which the plaintiff seeks a "deficiency judgment." In *Faber,* we noted that, "Technically speaking, *there is no such thing under our law as a 'deficiency judgment'* in the sense that a formal judgment of that description is rendered by the court, or entered by the clerk for the amount not made by the sale of the mortgaged property." 168 Ariz. at 219, 812 P.2d at 1036, quoting *Bank of Douglas v. Neel,* 30 Ariz. 375, 380–81, 247 P. 132, 134 (1926) (emphasis in original). Rather, in a foreclosure suit the judgment is given for the entire amount due. If the plaintiff has obtained personal jurisdiction over the debtor (in this case, the partnership or any of its general partners), then the plaintiff obtains a judgment for the full amount due and a writ of special execution mandating a sale of the security to satisfy that judgment. If the sale fails to fully satisfy the debt, the plaintiff may then proceed to satisfy the judgment by general execution on the defendant's or defendants' property. The foreclosure suit in which the plaintiff seeks a personal judgment against the debtor merely *combines* both actions into one. *Faber,* 168 Ariz. at 218–19, 812 P.2d at 1035–36. In such a case, there is no election and no waiver.

■ A creditor who may proceed against one jointly and severally liable need not necessarily be concerned about the status of the partnership or other partners who happen to be liable for the same debt. It is the concern of the party against whom judgment is rendered to attempt to have the joint obligors pay their fair share. Our supreme court has stated:

> In forming a partnership, the individual partner has created a buffer, not a shield. Considering our long-standing statutory provisions, a rule that permits the creditor to recover from the partner before the partnership assets are exhausted does not defeat the expectations of the partner who has failed to protect his personal assets by incorporating. Furthermore, the partner who pays more than his pro rata share may seek indemnification from the partnership. A.R.S. § 29–218.

*Catalina Mortgage,* 166 Ariz. at 75, 800 P.2d at 578.

## II. Was the judgment properly entered against the Acostas even though the Meadowbrook partnership had filed for bankruptcy?

Acosta argues that the extent of his deficiency liability "depends upon the outcome of the various adversary claims [he] filed that are still pending in the Partnership's bankruptcy proceedings." We will not consider this argument because Acosta has utterly failed to develop it: he has not even attempted to demonstrate to this court the connection between this appeal and those adversary claims. *See, e.g., Nationwide Resources Corp. v. Massabni,* 134 Ariz. 557, 565, 658 P.2d 210, 218 (App.1982).

## III. Is the Acosta marital community liable for any indebtedness of Acosta as a partner of the Meadowbrook partnership?

The marital community of Joe and Aurora Acosta next contends that it is not liable because Aurora Acosta did not join in the guaranty signed by her husband and, because the sole purpose of forming the partnership was to acquire real property, she was required to join in that acquisition. A.R.S. § 25–214(C) provides:

> Either spouse separately may acquire, manage, control or dispose of community property, or bind the community, except that joinder of both spouses is required in any of the following cases:
>
> 1. Any transaction for the acquisition, disposition or encumbrance of an interest in real property other than an unpatented mining claim or a lease of less than one year.
>
> 2. Any transaction of guaranty, indemnity or suretyship.

We dispose of the "guaranty" argument summarily. We held previously that Joe Acosta's liability to the bank was predicated upon his status as a general partner, not a guarantor. Likewise, here the bank seeks to impose community liability because of Acosta's status as a general partner and not as a guarantor. We therefore *do* not analyze this issue from the standpoint of A.R.S. § 25–214(C)(2) (the "guaranty" exception).

■ The Acostas' real argument is that the "acquisition of real property" exception to separate control of community assets is applicable because the sole business purpose of the partnership was to acquire real property. In so arguing, they, like the dissent, rely on this court's opinion in *First Interstate Bank v. Tatum & Bell Center Assoc.,* 170 Ariz. 99, 821 P.2d 1384 (App.1991). Before discussing that case, we must analyze, for the purpose of applying the "real estate" exception, the nature of a partner's interest in the assets of the partnership.

A.R.S. § 29–226 specifically provides that, "[a] partner's interest in the partnership is his share of the profits and surplus, and the same is *personal* property."[10] (Emphasis added.) That such a partnership interest is personalty and is subject to the control of either spouse as co-managers of the community without the joinder of the other spouse is made clear by *Cummings v. Weast,* 72 Ariz. 93, 231 P.2d 439 (1951). Although the facts in *Cummings* are somewhat convoluted, the pertinent facts, for our purposes here, are that a husband entered into a partnership that had as its sole purpose the sale and development of real property. The partnership was dissolved, and the husband, as part of the dissolution, quit claimed any interest he had in the partnership to his former partner, including any partnership interest in the real property. The wife did not join in this quit claim, and the husband's former partner sued the wife to quiet title to the real property involved. The Arizona Supreme Court held:

> When community personal property is invested in a partnership, it retains, as between the spouses involved, its character as community property, but is subject to the primary powers and duties governing partnership itself, which includes proper acts of partners inter sese.... Such community property is subject to the primary

---

10. Any inference in *Coe v. Winchester,* 43 Ariz. 500, 33 P.2d 286 (1934), that the community has an ownership interest in specific partnership assets, is belied by this statutory provision. This does not mean, of course, that the personal property interest of the partner is not community property.

charge of any liabilities to which the partnership may be subjected....

*Id.* at 98–99, 231 P.2d at 443 (citation omitted). The court then quieted title in the partnership property to the former partner over the wife's objections.

Also, the case of *Nationwide Resources Corp. v. Massabni,* 134 Ariz. 557, 658 P.2d 210 (App.1982), is instructive on this issue. In *Massabni,* the wife, but not the husband, signed an offer to sell a partnership interest in a leasehold. The wife was a partner. The court posed the question as follows: "Were the signature[s] of the spouse [of the partner's wife] necessary to make a valid offer?" The court quoted from DeFuniak & Vaughn, *Principles of Community Property* (1971):

> ... so far as community property is invested by the wife in the commercial partnership, any rights of the spouses therein, as a marital community, are not establishable until the satisfaction of the claims of the partnership creditors and partners' equities.... *Until then he has no half ownership and he has no voice in the management of the commercial partnership.*

134 Ariz. at 561, 658 P.2d at 214 (emphasis in original). The court concluded, "we believe that A.R.S. § 29–225, which deals with the nature of a partner's right in specific partnership property, demonstrates that the community has no interest in specific partnership property." *Id.* at 562, 658 P.2d at 215.

Thus, through a consistent line of Arizona authority, it is well established that the interest of a partner in partnership property is personalty; that if community funds are expended to acquire that interest, it is community personal property; that the community has no interest in specific assets of the partnership; and that the partner spouse may deal with partnership assets without the written consent of the non-partnership spouse, including the acquisition, encumbrance, and disposition of partnership real estate. It necessarily follows from this analysis that the "real estate" exception embodied in A.R.S. § 25–214(C)(1) does not apply to a spouse's partnership interest in a partnership for the simple reason that it is not realty, but personalty. Moreover, the community has no interest in specific partnership assets and, therefore, does not "acquire or dispose or encumber real property" when the partnership deals with its assets.

This then brings us to *Tatum & Bell.* In *Tatum & Bell,* the issue was whether general partners who executed a guaranty of a third party's obligation could subject the community property of the guarantors to liability without the concurrence of the guarantors' spouses. Without analyzing the partnership interest and the right to control and manage partnership property, the court posed the issue before it as whether it was a correct proposition of law that "a marital community that benefits from a partnership interest cannot raise lack of one spouse's signature as a basis to disaffirm partnership debt." 170 Ariz. at 104, 821 P.2d at 1389.

As posed, the question was correctly answered in the negative, relying on *Consolidated Roofing & Supply Co. v. Grimm,* 140 Ariz. 452, 682 P.2d 457 (App.1984). *Grimm* involved the shareholders of a corporation who signed a guaranty of a corporate indebtedness without the concurrence of their respective spouses. *Grimm* rejected the argument that A.R.S. § 25–214(C)(2), which prohibited the imposition of community liability without the signature of all spouses on the guaranty, was inapplicable simply because the community benefitted from the transaction. The court held that the statute controls where it prohibits specific conduct by clear and unambiguous language. 140 Ariz. at 455–56, 682 P.2d at 460–61. However, by no stretch of the imagination does *Grimm* stand for the proposition that the interest of a community in a community partnership is something other than personalty that the partner spouse is entitled to control, including the disposition of partnership real property. If such an inference can be drawn from *Tatum & Bell,* it is rejected.[11]

The dissent also relies upon this court's opinion in *Zork Hardware Co. v. Gottlieb,* 170 Ariz. 5, 821 P.2d 272 (App.1991). In *Zork,* there was an attempt, unilaterally, to convert

---

11. We likewise reject the result in *Meritor Savings Bank v. Camelback Canyon Investors,* 783 F.Supp. 455 (D.Ariz.1991), which relied on this unsupported inference in *Tatum & Bell.*

a separate debt into a community one, which is precisely what A.R.S. § 25–214(C) was intended to prohibit. Here, however, the dissent would do exactly the opposite—convert the community interest in the partnership into the separate debt of the husband.

In criticizing two federal district court opinions,[12] which relied upon *Tatum & Bell,* one commentator states:

> The *Meritor* court's application of section 25–214(C) creates several logical inconsistencies. As *Massabni* made evident, Arizona courts will treat real property belonging to a partnership as personal property to facilitate the partnership's interest in the rapid conclusion of business. *Meritor,* however, transforms that property back into real property to invoke the protection of section 25–214. This "have your cake and eat it, too" situation benefits the marital community, particularly the signing spouse, in all situations and, as *Meritor* demonstrates, damages creditors who are unfairly surprised by the change in character of the property or guaranty.
>
> Another logical inconsistency arises in considering the liabilities of a partner for the partnership's debts with and without section 25–214(C). Under Arizona's adaptation of the Uniform Partnership Act, a general partner is liable for all debts of the partnership. Application of the *Meritor* decisions, however, would yield the inconsistent result of releasing the debts of partners who are married and do not have sufficient separate property assets. In effect, single partners and married partners who have made efforts to maintain separate property during their marriage, would lose that separate property, while married partners with all assets in the community would be held harmless by the courts. This likely was not the intent of the 1973 legislature in enacting section 25–214(C).

John Joseph Tuchi, Comment, *Creditors Take Heed! The Interpretation of Arizona's Community Property Management and Control Statute and its Effect on Partner-* *ship Debts,* 25 Ariz.St.L.J. 695, 705 (1993) (footnotes omitted).

In short, contrary to the dissent, *Tatum & Bell* and those federal cases that rely upon it are simply inconsistent with and contrary to the established law and public policy of this state.

Aurora Acosta, for the first time in the reply brief, raises the factual issue whether her husband's entrance into the partnership was for a "non-community" benefit, and therefore the community had no interest in the partnership that would lead to the imposition of community liability. Issues raised for the first time in a reply brief will not be considered by the court. *See* Rule 13(c), Arizona Rules of Civil Appellate Procedure (reply shall be confined to rebuttal of response).

**IV. Could the bank properly seek a deficiency judgment for the unpaid portion of the debt even though it judicially foreclosed on less than all the property covered by the mortgage given to secure the note?**

█ Acosta argues that the trial court erred in entering summary judgment because there were issues of fact material to his counterclaim. He asserts that the bank was negligent in failing to obtain a first position on the apartment property, thereby impairing its security and increasing the risk he would have to pay a deficiency judgment. He also argues that the bank's action in splitting the property between the restaurant parcel and the apartment parcel reduced the amount it received in the "forced sales," thus increasing the amount of the deficiency judgment against him.[13] We find no merit in this argument.

The trial court held that the bank's insistence on being in first lien position did not amount to a promise to Acosta, or to anybody else, that it would obtain such a first lien position. There was, consequently, no duty owed. We agree that no reasonable juror

12. *Meritor Sav. Bank v. Camelback Canyon Inv.,* 783 F.Supp. 455 (D.Ariz.1991) (*Meritor I*) and *Meritor Sav. Bank v. Camelback Inv.,* 792 F.Supp. 697 (D.Ariz.1992) (*Meritor II*).

13. He asserts it is "axiomatic" in real estate practice that "the sum is greater than the sum of the parts."

could, from the evidence presented, find such a promise by the bank. *See Orme School v. Reeves,* 166 Ariz. 301, 802 P.2d 1000 (1990) (summary judgment appropriate if no reasonable juror could find for the party based on the evidence).

■ We also find a total lack of causation. As the bank points out, it was under no legal requirement to foreclose on the property; it could have waived the security and sued directly on the note. *See Darnell v. Denton,* 137 Ariz. 204, 206, 669 P.2d 981, 983 (App. 1983). Because the bank could have proceeded directly against Acosta as general partner for the full amount of the partnership debt (*see* discussion *supra* ), the bank's election to foreclose on the property and credit the amount received from its sale against the debt operated in Acosta's favor. It follows that Acosta suffered no legal detriment as a result of any impairment of the security.

## V. Cross–Appeal: Attorneys' Fees

The promissory note contained the following provision: "The undersigned agree to pay all costs of collection when incurred, including reasonable attorneys' fees." In its cross-appeal, the bank argues that the court improperly reduced the amount of attorneys' fees to which it was entitled. The bank attacks two separate decisions: (1) the court's reduction of the amount awarded in the superior court by an amount nearly identical to the fees incurred by the bank's first law firm, Murphy & Posner; and (2) the court's denial of all fees for the bankruptcy proceedings against the partnership and Grant. We consider them in order.

### A. Superior Court

In the judgment, the court found that the bank incurred attorneys' fees in the superior court in the amount of $84,174.[14] The bank initiated the superior court proceeding, utilizing the services of the law firm of Murphy & Posner. When the bankruptcies were filed, the bank switched to the law firm of Streich

Lang. In its application for fees in the superior court, the bank's attorneys submitted two affidavits, one from current counsel and one from former counsel. The fees attributable to Streich Lang amounted to $50,320.50, while those attributable to Murphy & Posner amounted to $32,853.50. The court awarded $51,321.50, which is a reduction of either $31,852.50 or $32,852.50 from the amount requested.

The bank asserts that the court wrongfully denied the fees requested for Murphy & Posner's services, contending that the court must have accepted Acosta's arguments that these were duplicative. We cannot agree. Had the court agreed with Acosta that *all* of the Murphy & Posner fees should not be awarded, it would simply have awarded $50,-320.50, the amount requested for Streich Lang's services. While the actual amount is very close, it appears more likely to be a coincidence.

■ This court reviews the amount of the award under an abuse of discretion standard. *Woliansky v. Miller,* 146 Ariz. 170, 172, 704 P.2d 811, 813 (App.1985). The most cursory review of the Murphy & Posner affidavit reveals inadequacies: in many instances the description of the services rendered do not adequately inform the court of the relevancy of the service. The same is true in many instances in the Streich Lang affidavit. Because neither affidavit totally comports with *Schweiger v. China Doll Restaurant, Inc.,* 138 Ariz. 183, 673 P.2d 927 (App.1983), we find no abuse of discretion in the reduction of fees awarded for services in the superior court.

The amount of fees is peculiarly within the trial court's discretion. Appellate courts are hesitant to second-guess the trial court on awards of attorneys' fees "in view of the [trial court's] superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Associated Indem. Corp. v. Warner,* 143 Ariz. 567, 571, 694 P.2d 1181, 1185 (1985) (case involving A.R.S. § 12–

---

14. This amount appears to be a typographical error in the form of judgment submitted by the bank. The bank's request stated that attorneys' fees incurred in the superior court were $84,174.

This appears to be a mathematical error. The bank submitted two affidavits, one totalling $50,-320.50, the other totalling $32,853.50. The sum of these is $83,174.

341.01(A)), quoting *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).

## B. Bankruptcy Court Proceedings

The court refused to award any fees incurred in the bankruptcy proceedings of the partnership and Grant.

■ A contractual provision for attorneys' fees will be enforced according to its terms. *First Fed. Sav. & Loan Ass'n v. Ram,* 135 Ariz. 178, 181, 659 P.2d 1323, 1326 (App.1982); *Heritage Heights Home Owners Ass'n v. Esser,* 115 Ariz. 330, 333–34, 565 P.2d 207, 210–11 (App.1977). Unlike fees awarded under A.R.S. § 12–341.01(A), the court lacks discretion to refuse to award fees under the contractual provision. *Sweis v. Chatwin,* 120 Ariz. 249, 252, 585 P.2d 269, 272 (App.1978). The trial court, as discussed above, did not refuse to award fees to the bank. The provision for attorneys' fees in the promissory note stated: "The undersigned agree to pay all costs of collection when incurred, including reasonable attorneys' fees." We hold that the trial court complied with this contract provision. This was the action in which collection of the debt occurred as to Acosta. Acosta cannot be held responsible for fees the bank may have incurred in Grant's bankruptcy. Likewise, Acosta did not bring about the bankruptcy of Meadowbrook.

We therefore affirm the trial court's denial of the bank's request for fees incurred in the bankruptcy proceedings.

## VI. Attorneys' Fees on Appeal

The bank has requested attorneys' fees incurred in this appeal based on the promissory note. As to the direct appeal, because we affirm the judgment in all respects, we grant the bank's request. Because we affirm on the issues raised by the bank in its cross-appeal, we will not award the bank any fees incurred in the cross-appeal. The bank is directed to file a request in compliance with Rule 21(c), Arizona Rules of Civil Appellate Procedure.

The Acostas have also requested fees on appeal. Because in the direct appeal the judgment is affirmed as against the Acostas, they are entitled only to their fees incurred in the cross-appeal, and they are directed to comply with Rule 21(c).

## CONCLUSION

The judgment is affirmed. The award of attorneys' fees incurred by the bank in the superior court is affirmed. The denial of all fees incurred by the bank in the bankruptcy court is affirmed. The bank is entitled to its fees incurred in the direct appeal. The Acostas are entitled to fees incurred in defending the cross-appeal.

WEISBERG, Judge, concurring.

The legislature has adopted two policies that come into conflict in this case. On the one hand, we have the enactment of the Uniform Partnership Act, with the goals of promoting the free flow of commerce and the use of general partnerships as a form of business. On the other hand, we have community property statutes that require joinder whenever real property or a guaranty is involved, with the goal of protecting the marital community and a non-consenting spouse.

Some legislatures in other community property states that normally require joinder of both spouses when dealing with real property have nevertheless decided that the acts of a general partner-spouse should bind the marital community and the non-consenting spouse. *See* Cal.Corp.Code § 15025(2)(e) (West 1991); *McKnight v. McKnight,* 543 S.W.2d 863, 867–68 (Tex.1976) (interpreting Texas Uniform Partnership Act); *Attaway v. Stanolind Oil & Gas Co.,* 232 F.2d 790, 794 (10th Cir.1956) (New Mexico). Our legislature, however, has not indicated which policy should be controlling when there is a conflict.

Although our legislature has not indicated which policy should control, I agree with the rationale of the majority opinion that the Arizona Supreme Court has decided this question. *See Cummings v. Weast,* 72 Ariz. 93, 231 P.2d 439 (1951). In *Cummings,* the court held that "the community interest of a spouse in a partnership such as this [real property] and its assets is subordinate to the power of the partners under the agreement

of the partnership...." *Id.* at 99, 231 P.2d at 443. Although our supreme court may wish to revisit this issue, we are bound by existing precedent. *Bade v. Arizona Dept. of Transp., Motor Vehicle Div.,* 150 Ariz. 203, 205, 722 P.2d 371, 373 (App.1986).

I recognize that anomalies can be created by subordinating community property rights to partnership rights. For example, a spouse could enter into a general partnership without his or her spouse's knowledge, and then acquire real property, encumber it, and dispose of it, all the while binding the non-consenting spouse. While it still would be necessary to determine that the partnership was valid, and not merely a subterfuge to avoid community property restrictions, by such means a partner-spouse would be able to do what a non-partner-spouse could not.

I respectfully disagree with one non-essential point of the majority opinion. The opinion distinguishes the instant case from this court's decision in *Tatum & Bell* by focusing on *Tatum & Bell*'s reliance upon the reasoning in *Grimm.* I do not believe that the court in *Tatum & Bell* relied upon the reasoning in *Grimm.* Instead, the *Tatum & Bell* court simply concluded that community property rights prevailed over partnership rights and, therefore, a partner-spouse could not unilaterally bind the community to a guaranty even while acting as a general partner. Obviously, this policy decision would apply just as readily to the purchase of real property.

Notwithstanding the *Tatum & Bell* court's policy decision, I believe that this court is bound by the precedent of *Cummings* until and unless our supreme court or legislature decides otherwise.

GRANT, Judge, concurring in part and dissenting in part.

I concur in all parts of the majority opinion except Section III regarding the liability of the marital community for any indebtedness of Joe Acosta as a partner of the Meadowbrook partnership. As to that part of the opinion I respectfully dissent.

I believe that *First Interstate Bank of Arizona v. Tatum and Bell Assoc.,* 170 Ariz. 99, 821 P.2d 1384 (App.1991) controls this issue, although the case involves a guaranty, guaranties and real property are subject to the same statutory provision. Arizona Revised Statutes Annotated section 25–214(C) specifically requires the signatures of both spouses to bind the marital community in order to acquire, dispose of or encumber real property. I do not believe that the statute can be circumvented by one spouse's participation in a partnership that is formed specifically for the purpose of dealing in real property. The legislature wrote A.R.S. section 25–214(C) broadly:

[J]oinder of both spouses is required in any of the following cases:

1. *Any transaction* for the acquisition, disposition or encumbrance of an interest in real property.... (emphasis added).

In *Tatum and Bell,* this Court stated:

First Interstate attempts to evade this statute by arguing that it pertains only when a spouse attempts to bind the marital community by signing a guaranty and not when, as here, the spouse binds a general partnership to a guaranty. In the latter circumstance, the argument continues, if a general partner's interest belongs to his marital community, the marital community is likewise responsible for partnership debt.

We find this argument strained and unpersuasive. In effect, First Interstate argues that a marital community that benefits from a partnership interest cannot raise lack of one spouse's signature as a basis to disaffirm partnership debt. This court has already rejected such an argument:

While there may be circumstances where a spouse may be estopped from disaffirming a contract, we are constrained from adopting a rule which would preclude a spouse from disaffirming any contract from which the community has received benefits. To adopt such a rule would effectively emasculate the requirements of A.R.S. section 25–214(C). *Consolidated Roofing & Supply Co. v. Grimm,* 140 Ariz. 452, 458, 682 P.2d 457, 463 (Ct.App.1984).

We found in *Grimm* that the plain language of section 25–214(C) "requires that both spouses must execute a guaranty in order to bind the community." *Id.* Our supreme court has found that the statute "was intended to protect both spouses' interest in their common property." *Geronimo Hotel & Lodge v. Putzi*, 151 Ariz. 477, 480, 728 P.2d 1227, 1230 (1986). *Tatum and Bell*, 170 Ariz. at 104, 821 P.2d at 1389. Clearly, Joe Acosta's commitment of community assets to secure the partnership's acquisition of commercial real estate constituted a "transaction for the acquisition, disposition or encumbrance of an interest in real property." The majority elevates form over substance when it concludes that Joe Acosta's interest in a partnership that was formed for the sole purpose of acquiring commercial real estate was an interest in personal property, not real property.

By its use of the most expansive possible language—"Any transaction"—the legislature intended to provide broad protection to spouses against the unilateral disposition of community assets in real estate deals. The majority's approach undermines this legislative intent and instead protects creditors who have an opportunity to obtain both spouses' signatures but fail to do so. This is inconsistent with the established principle that the party who is in the best position to protect against a risk should have the burden of doing so. *See Consolidated Roofing & Supply Co. v. Grimm*, 140 Ariz. 452, 458, 682 P.2d 457, 463 (App.1984) ("Since only [the husband's] signature appeared on the guaranty, [the creditor] should have been aware that the marital community was not bound.").

As a result of the majority opinion in the present case, if one spouse wants to purchase real estate but cannot obtain the other spouse's consent, the first spouse can evade the requirements of A.R.S. section 25–214(C) by simply forming a partnership and purchasing the real estate through the partnership. The spouse who does not consent, or who is never even asked for his or her consent, will now be bound by the unilateral actions of the other spouse and stands to lose his or her entire share of the community's assets, possibly without ever even knowing

that the real estate transaction took place. One spouse should not be able to change what is a separate obligation into a community obligation by unilaterally signing a promissory note. *Zork Hardware Co. v. Gottlieb*, 170 Ariz. 5, 821 P.2d 272 (App.1991).

The majority is wrong when it relies on *Nationwide Resources Corp. v. Massabni*. First of all *Massabni* was decided before this Court's decision in *Tatum and Bell*. In *Massabni*, not the husband, but the wife, acting as a general partner, signed an offer to sell the *partnership's* interest in a leasehold. Division Two of this Court did not allow the non-partner spouse (the husband) to reach within the partnership and nullify the action taken by the partnership on the basis of claiming an interest in the partnership's real property pursuant to A.R.S. section 25–214(C). The case before us is the opposite of *Massabni*. Chase is attempting to reach through the partnership into the marital community and bind the community to an agreement in which only one spouse acted to join.

The Acostas do not argue that the actions of the partnership should be nullified. Here, Chase loaned money to the partnership for the purchase of real property. The note was secured by a mortgage on the property. The partnership defaulted on the loan and the property, having declined in value, was insufficient to cover the note. The bank may properly obtain a deficiency judgment against Joe Acosta as a general partner. The question in this case is whether this transaction should also be binding against the marital community of the general partner when there has been no compliance with A.R.S. section 25–214(C). For the bank to assert that Joe Acosta has unilaterally bound the marital community to this transaction flies directly in the face of the plain meaning of the statute and of our decision in *First Interstate Bank v. Tatum and Bell*.

The bank was not without power to protect itself in this situation. Prior to loaning the partnership the required funds, the bank required the personal guaranty of each of the partners, including Joe Acosta. The bank carefully points out that it is not bringing this action based on these personal guaran-

ties. The reason for this is clear: the law is well settled that a guaranty executed by only one spouse is only binding against that spouse's separate property. If the bank wished to bind the marital community of the each of the partners, it could have insisted that the spouses of the partners either join in signing the guaranty or join in the partnership. The bank did neither. The bank, having failed to protect itself, should not now be allowed to reach back through the partnership to grasp the Acostas' marital assets to make up the deficiency.

In *Lorenz–Auxier Fin. Group v. Bidewell,* 160 Ariz. 218, 772 P.2d 41 (App.1989), this Court held that one spouse acting extraterritorially, without the other spouse's consent, could not enlarge the dispositional power over the parties' marital property beyond the limits imposed by the law of the domiciliary state. However, today's majority opinion would apparently allow a spouse to enlarge these powers simply by acting through a partnership instead of personally. This Court should continue to follow *Tatum and Bell* and the line of cases on which it is based and not allow one spouse to unilaterally and unfairly bind the marital community to a purchase of land when it is clear that if that spouse acted personally instead of through a partnership, the marital community would not be bound.

For the reasons I have set forth I would agree with the majority in affirming the judgment as to Joe Acosta, individually. However I would reverse the judgment as to the marital community of Joe and Aurora Acosta.